JAMES H. REED, Appellant, *v.* CYRUS P. BRADLEY *et al.*, Appellees.

APPEAL FROM COOK.

Where a corporation is authorized to execute a mortgage, and the exigency of its affairs and its interests demanded that one should be made, of which it should be the proper judge, it will be sustained.

The seal of a corporation is *prima facie* evidence of the assent of the company.

A mortgagee of a telegraph company who has advanced money in good faith, to organize and maintain its business, having taken the management of its affairs upon himself, to secure the repayment of his loan, can maintain replevin for the mortgaged property; although a circular may have been issued in the name of the company, soliciting business, he could only use the franchise in the name of the corporation, and such circular would not conclude his rights.

A bill of exceptions, which shows that all the evidence in the case is set forth in it, will be sufficient.

THE action below, was replevin. The declaration contains one count, charging that the defendants took from the plaintiff several articles connected with a telegraph office, and all the polls and wires in the county of Cook, and attached to the office, known as the Southern Michigan Telegraph Company, in the city of Chicago, of which the plaintiff was entitled to the possession.

To this action the defendants filed two pleas. 1st plea, that they did not take the said property. Issue joined thereon. 2nd plea, that Bradley was sheriff, and defendant, Norton, was his deputy, and are lawfully entitled to the possession of the property, because they seized and held the same under a writ of attachment, in favor of Julius G. Lombard against the Southern Michigan Telegraph Co., returnable to the Cook county Circuit Court, at the November term, 1853; and under said writ they,

on the 17th day of October, 1853, seized and held said property, &c., with usual averments of ownership. To this plea there was a replication that plaintiff was entitled to the possession, &c.

The cause was submitted to the court, MORRIS, Judge, presiding, at November term, 1853, who found the issue of the first plea for the plaintiff, and on the second for the defendant, and ordered a *returno* of the property, and divided the cost.

The only error assigned is in these words: "The finding of the court, upon the issue presented by the defendants under the second amended plea, and avowry, and the judgment therein rendered in awarding a return of the property in the declaration mentioned to the defendants, was against evidence in the case, and the law as applicable thereto."

The taking was admitted on the trial, and the only question was, whether, at the time of the taking, the plaintiff was entitled to the possession of the property.

The plaintiff claims to have held the property under two certain mortgages, executed by the Southern Michigan Telegraph Company, on the 5th day of April, and 4th day of August, 1853, to secure certain advances made by him to said company, for the purpose of repairing their line and putting it in a working condition, and also claimed that he had furnished all the materials with which that portion of the line lying within the limits of the county of Cook was constructed, and had advanced all the money, which had been used for that purpose. And that he had, therefore, a clear right to retain the possession thereof until such advances were repaid to him.

The defendants justify the taking by virtue of an attachment writ, issued at the instance of a creditor of the Southern Michigan Telegraph Company, October 15, 1854.

The first mortgage under which the plaintiff claims, recites the condition of the entire line of the company, lying in the States of Michigan, Indiana, and Illinois, its want of repair, &c., and the proposal of the plaintiff to advance to the company the means necessary for repairing their line, such advancement not to exceed the sum of $5,000. The said company, in consideration of such advances, sold and transferred to said plaintiff their entire line or lines of telegraph owned by them, and extending from Detroit, in the State of Michigan, to Adrian, in the same State, and from the city of Monroe to the city of Chicago, through portions of the States of Michigan, Indiana and Illinois, together with all the property appertaining thereto. And as a further security for the repayment of such advances, the plaintiff was authorized to take immediate possession of the property so transferred, and to have the entire management and control of the same, and to apply the profits over and above the

expenses of operating the line, to the satisfaction of the mortgage debt.

The mortgage also contained the usual power to sell in case of default.

The second mortgage recites the former mortgage, that the sum of $5,000 had been duly advanced to the company, and that the same had been found insufficient, and provides for the further advancement of $2,000, for the purpose of putting the line in a working condition. The sum advanced under the second mortgage, is to be repaid in one, two and three years from the date of the mortgage, with annual interest at the rate of ten per cent. per annum. This mortgage also provides for a sale of the mortgaged property in case of default in either of the payments.

Possession was to accompany the first mortgage, and was expressly made a condition upon which the advancement was to be made, and the sum advanced was to be repaid, in four, equal annual payments, from the 1st day of May, A. D., 1853.

The corporate seal of the company was duly attached to each of the mortgages, and the signatures of the proper officers were duly proved.

Neither the act of the legislature of Michigan, incorporating the company, nor the act referred to in the act of incorporation, provides any particular mode in which the deeds of the company shall be executed or acknowledged; and, besides, the evidence clearly shows that the authority was duly given for the execution of the mortgages.

The witness, George Allen, after proving the execution of the mortgages, states that he was employed by Mr. Reed, about the 1st of March, 1853, to come to Michigan for the purpose of taking charge of the property of the company, as the agent of Mr. Reed, and to rebuild and repair the line, in case the terms proposed by Mr. Reed were acceded to by the company; that he took possession of all the property mentioned in the mortgages, as the agent of Mr. Reed, under the first mortgage in the course of two or three weeks after its execution, and as soon as he could leave; that Mr. Reed had accepted of the mortgages; and that he took possession as the agent of Mr. Reed. He states the condition of the line at the time he took possession; that some portion of it had been sold under executions against the company; that the line originally extended from Monroe and Detroit by the way of Adrian to Chicago; and that that portion of the line lying within the limits of the county of Cook, had been sold under executions against the company and taken away; that Mr. Reed advanced to him under the first mortgage $5,000, including wire sent to him by Mr. Reed from New

York, and with this money and wire, he reconstructed and repaired the line to a point somewhere between South Bend and Laporte, in the State of Indiana, when the second mortgage was executed ; that Mr. Reed advanced $2,000 under the second mortgage, including wire which he purchased in New York and sent to him ; and that with this money, and the wire so sent, he reconstructed the line from Laporte, Indiana, to or near Chicago ; that Mr. Reed made other advances to him for the company, which were secured by a subsequent mortgage executed by the company in April, 1854, with which the whole line was entirely completed ; that it was finished by the 17th of November, 1853 ; that all the materials with which that portion of the line lying within the limits of the county of Cook, was reconstructed, including the property taken by the defendants, were either sent by Mr. Reed or purchased with money sent by him ; that at the time of the taking of this property by the defendants he was in possession of it and of all the property of the company, as the agent of Mr. Reed, and had been in such possession, as the agent of Mr. Reed, from the time he first took possession, some two or three weeks after the execution of the first mortgage ; that the possession of the property had never been given to the company, but was retained by him as the agent of Mr. Reed, and that from the time when he first took possession, until the 14th of November, 1854, he worked and operated the line as the agent of Mr. Reed, and charged him with receipts ; and that the company never interfered with his management and control of the property, as the agent of Mr. Reed ; and being questioned by the court he says : I kept, with Mr. Reed, a regular account of the advances made by him, and of the amount received in operating the line. In my transactions as the agent of Mr. Reed, in operating the line, I signed receipts, and executed all papers in his name, and as his agent, and it was known by those acquainted with the affairs of the line, that I was in possession as his agent.

In June, 1854, there had been paid to Mr. Reed on the first mortgage, from the earnings of the line $1,818.73, which is thereon indorsed, and on the third mortgage $1,174, which is also indorsed thereon. Allen states, that he was during this time, also, the secretary of the company ; but states as a reason why he was appointed secretary of the company, that it was supposed he should be better acquainted with its affairs, while acting as the agent of Mr. Reed.

The only evidence offered by the defendants, was the circular issued in the name of the Southern Michigan Telegraph Company, dated September 26th, 1853, addressed to the merchants and public generally of Chicago. Which announced the com-

pletion of the line, described the material of which it was constructed, and recommending it to the patronage of the public, soliciting business.

HOYNE and MILLER, for Appellant.

MILLER and FOWLER, and SHUMWAY and WAITE, for Appellees.

SCATES, C. J. The charter of the Southern Michigan Telegraph Company, fully authorizes them, as we think, to make the several mortgages relied on by the plaintiff, as showing property and a right of possession in him. If the exigency of their affairs, and the interests of the company demanded that these incumbrances should be made, and of this they must be allowed to judge, and not a stranger, we should not feel warranted in setting aside a fair contract, with which both parties were content, although it be at the instance of a creditor, unless such creditor can show that his rights are prejudiced by it. These are under the signature of the president and the seal of the company regularly made, and the subject matter of them, calculated to promote the objects contemplated by, and within their charter, and the interests of the company. The seal is *prima facie* evidence of the assent of the company. *Lovett* v. *Steam Saw Mill Association et al.*, 6 Paige R. 54; *Johnson* v. *Bush*, 3 Barb. Ch. R. 207; Angell and Ames on Corp., 192, Sec. 6, 194, Sec. 7.

We have heard no solid or valid objection urged against the fairness or legality of these mortgages. The plaintiff has insisted upon his right to retain the possession of the telegraph line, with all its fixtures and attachments, under a right of lien in the nature of the lien of mechanics, for labor in making or repairing articles of personal property, and upon the materials they may provide and use for these purposes. (See for this principle of law *Moore* v. *Hitchcock*, 4 Wend. R. 292; *Gregory* v. *Styker*, 2 Denio R. 628.) But I am not prepared to admit the analogy, or the application of the principle to this case. The plaintiff does not present himself in this record as a mechanic, but rather as a capitalist. Rather as investing his money in an enterprise of others, taking a mortgage of the property and the management of the expenditure, and the operation of the enterprise for a security. Neither does he stand before us in the character of a vendor, insisting upon retaining possession of the article sold, until paid the price. He is in the attitude of bailee or mortgagee, and upon that he must stand, and defend his rights. In this character he has very clearly shown title in himself sufficient to entitle him to recover the articles

replevied, unless defendants can show that the rights of Lombard, the attaching creditor of the Telegraph Company, is injured thereby, or has paramount right to satisfaction out of this property, as the property of the company.

There is nothing shown in the transaction itself, as between the plaintiff and the telegraph company, to set the mortgages and arrangements aside. On the contrary it not only appears to have been fair, and *bona fide*, but eminently for the benefit of the company, as well as their creditors. When Reed took it, the enterprise seems to have proven a failure, either for want of sufficient means to develope it, mismanagement, or its intrinsic worthlessness. Having furnished the means to repair, rebuild, and put it in operation, under his management it had already on the day of trial, within about a year, repaid him from profits about $3,793.73, which had been indorsed upon the mortgages.

The only grounds presented, to impeach this transaction, and subject the property to the payment of the company's debts, without regard to Reed's rights, are, that it has been held out to the public as the property, and in the name of the company, in a circular inviting patronage, and that Lombard is a creditor of the company.

Taking all this for truth, and still the rights of Reed are not impaired or affected. The simple existence of a debt, does not put it out of a debtor's power to sell or incumber his property in an ordinary, fair, business way. It must be fraudulent, or done to hinder and delay creditors. This does not appear. Besides the equity of redemption in the debtor, mortgagors may be liable to Lombard's claim. Taking this, might be just and right, while it would be iniquitous to take with it, not only all that they pledged to Reed for security, but some five thousand dollars' worth of Reed's money spent in improvements upon it. Defendants should have shown that Lombard was a creditor by proving a debt from the company to him, in order to put him and themselves in a position to question this transaction as between the parties.

How and when was that debt contracted? Was credit given the company on account of the circular? No such facts are shown. See *Damon* v. *Bryant*, 2 Pick. R. 413; *Pierce* v. *Gibson*, 2 Carter Ia. R. 408.

The use of the name of the company was proper and necessary in the management of the telegraph line. The company, and not Reed, owned the franchise to build and operate the line. This franchise had not been forfeited, lost or waived by the mortgage arrangement; nor had Reed any right to exercise this franchise in his own name, but only in the name, and as

assignee, of the company. He was assignee only of the property with liberty to operate and manage—which could only be in the name of the corporation. This he had a right to use for the purposes provided in the mortgages. We use these arguments as illustrations of this case only; for Reed, in this case did not claim, or profess to operate this line in his own name, but under the company as mortgagee in possession. We, therefore, pass no judgment on his right to exercise the corporate franchises in his own name as mortgagee or purchaser. The explanation seems full, fair and consistent, why the circular invited public patronage in the name of the company. But at the same time the property was, and had been actually in Reed's possession under the mortgage, which was notice to all concerned to put them upon inquiry. It is true that George Allen was, a portion of the time, both secretary of the company and agent for Reed. No one might know his character either as secretary or agent, without inquiry—and by it, they could easily learn that he claimed and possessed the property, as agent of Reed. He held the secretaryship for the convenience of keeping the mutual accounts. His possession should have put Lombard upon inquiry into the ownership, before he trusted the company, on the faith of the property. Such inquiry would have led him to a true knowledge of all the facts.

In every light in which we have been able to view these facts, injustice seems to have been done Reed by the finding and judgment.

After hearing a second argument of this cause and careful consideration of the bill of exceptions, we deem the same sufficient to show that all the evidence in the case is set forth in it. This is all that is required by *Stickney* v. *Cassell*, 1 Gil. R. 420. And it is not obnoxious to the objection in *Buckmaster* v. *Coal*, 12 Ill. R. 74, of being a mere outline. This bill recites at large the evidence of both parties, and concludes that "upon the evidence aforesaid" the cause was submitted, and the court found the issues. This phraseology necessarily excludes that any further, other, or more was before it.

Judgment reversed and cause remanded.

*Judgment reversed.*