MORSE ARMS MANUF'G Co. *v.* WINCHESTER REPEATING ARMS Co.

WINCHESTER REPEATING ARMS Co. *v.* MORSE ARMS MANUF'G Co.

*(Circuit Court, D. Connecticut.  July 18, 1887.)*

1. PATENTS FOR INVENTIONS—INFRINGEMENT—BREECH-LOADERS.
    The first and second claims of patent No. 15,995, granted to George W. Morse, October 28, 1856, for devices used in the operation of breech-loading military fire-arms, are not infringed by the manufacture of arms by the Winchester Repeating Arms Company, which are made under the Smith & Wesson patents of 1854, and the B. Tyler Henry improvements thereon, patented in 1860.  In the Winchester gun the rim of its breech-block is not inserted into the barrel, as required in the first claim of the Morse patent, and it does not have the nippers, S, or radial hooks, operating in substantially the same way, as required in the second claim.

2. EQUITY—MISTAKE—REMEDY AT LAW.
    A note was given in consequence of a mistake of material facts into which the agent of the maker was led, without laches on his part, and without fraud on the part of the agent of the payee, the former having at hand the means of knowledge from which, by a more exhaustive examination, the discovery of the mistake could have been made.  Upon a cross-bill filed by the maker for the cancellation of the note, *held*, that as, upon these facts, the defense was fully open to the maker in an action at law, the bill should be dismissed. without prejudice to the right of the maker to interpose its defenses in any action, except the defense of fraud.

On Bill and Cross-Bill.

*Samuel A. Duncan* and *Edmund Wetmore*, for plaintiff.

*John K. Beach, John S. Beach*, and *B. F. Thurston*, for defendant.

SHIPMAN, J.  The main case is a bill in equity based upon the alleged infringement of letters patent No. 15,995, which were granted to George W. Morse, on October 28, 1856, for the term of 14 years, for improvements in breech-loading fire-arms, and which were extended for a period of seven years, from November 29, 1872.  The bill was filed November 23, 1875.

Before 1856, many breech-loading military guns had been invented, but all are said to have possessed two general objections:

"(1) Want of solidity of the parts most exposed to the action of the charge. (2) Liability of the movable parts to become unserviceable by their getting fast from rust or dirt deposited at each discharge, and the escape of the gas through the joints or junction of the different parts." Report of Ordnance Board of U. S. Army, June 21, 1848.

A joint at the breech, which was made as tight as possible, was the construction which was ordinarily relied upon in military arms to prevent the escape of gas. Tight joints became clogged with dust, or became heated and expanded after frequent firing, and, after exposure to the elements, became rusty and therefore unserviceable. The patentee's gun, on the contrary, had an intentionally open joint, and relied entirely upon the expansion, at the time of the explosion of the cartridge, of a yielding metallic cartridge case, to close the joint. It becomes important to ascertain the relation which the gun had to its predecessors in the art of military breech-loading arms.

In one of the forms of the Paully cannon, which was described in his English patent of 1816, a *culot* or cartridge stopper was attached to the rear of the cartridge, which, the patentee said, "is so placed in the gun as to come between the charge of powder and the movable breeching in all cases, and is formed of lead, copper, or such other desirable material as will give way to the explosive force of the charge, and so formed and situated that by yielding or giving way it will completely and effectually cover and close up the joint or joining between the movable breeching and the gun itself."

The door or movable breeching of the gun was so adjusted at its hinge that the flat side which came nearest the chamber of the gun did not rub or touch against the cavity made to receive it, but only against the cartridge stopper. By means of powerful mechanism, the door was "forcibly driven upon the *culot* to fix the same with the cartridge in the gun." There was a loose joint between the movable breeching and the chamber, but this was stopped by the *culot*, which was a sort of false breech, and was so wedged in before the gun was fired as to make a very close contact or tight fit with the breech. Although the patentee says that by its yielding or giving way, after the explosion of the cartridge, it will close the joint between the movable breeching and the gun, I do not consider the device to be an anticipation of an open joint. It was an attempt made, by the aid of expansible soft metal, to close, both before and after firing, a joint between the breech and the chamber.

The sealing of a breech-loading sporting gun, and the consequent prevention of the escape of gas by means of the expansion of an exploding cartridge against the walls of the chamber, had been effected in the gun of Lefaucheux, which was described in the report of Baron Seguier to the Society for the Encouragement of Industrial Science, in March, 1835. Notwithstanding the prophecy in the report that henceforth not "exactness, but only the solidity of the closing parts will render the problem of the manufacture of arms of the broken breech system difficult to solve," it

is clear that the joints of Lefaucheux's gun were tightly fitting, and the maker must have relied in part upon the tight fit for the prevention of the escape of gas.

Walter Hunt, in his cartridge patent of 1850, also prophetically declared that all reciprocating breech-pins must be loosely fitted in the breech of the barrel, behind the charge, in order to prevent binding from heat, deposits, etc., in rapid firing, but he did not give the description of the gun.

The Flobert saloon pistol, patented in 1849, and the Pryse & Redman improvement upon it, patented in 1853, each had an open joint between the wide hammer, (which also served as a breech block to resist the recoil of the cartridge,) and the barrel, and used a cartridge which was the only means of sealing the open joint, and which in the Pryse & Redman pistol did seal it. The Flobert pistol was a small one, used only for saloon or target practice. The escape of gas was not prevented by the hammer. The patent says that the hammer, which produces the percussion by its blow, would go back with the same elasticity with which it struck,—just enough to allow the escape, like a valve, of the excess of force. The Pryse & Redman pistol was a stronger weapon than the Flobert; the improvement consisted in a latch or bolt pivoted to the top of the hammer for automatically locking it, so that it would not go back when the pistol was fired. This arm had a combined hammer and breech piece, and, of course, did not have a breech piece which held the cartridge in its seat to receive the blow of an independent hammer. The breech block was, therefore, not strong enough for, or adapted to, a military gun.

The Smith & Wesson gun, patented in this country, February 14, 1854, had a more open joint than any preceding military or sporting gun. The character of the joint, as it is now shown in the patent-office model of the gun, is thus stated by Mr. V. D. Stockbridge, one of the plaintiff's experts:

"The patent-office model has a breech-pin or piston, which moves forward into a counter-bore in the rear end of the barrel, or that part of the metal which constitutes the barrel, and nearly fills such counter-bore, and, also, so near as I can ascertain with the facilities I have at present, comes up very close to the shoulder, forming the bottom of the counter-bore, and where the barrel proper ends. By experiment, I find that the breech-pin can be inserted into the counter-bore, and into a locked position, with an envelope of thin paper across its front face, and over the top and bottom sides. It follows, therefore, that this breech has not a very tight fit. I find, however, that the piston is slightly tapered at the top of the front end, and being made of comparatively soft metal for purposes of a breech block, the looseness may be due to the wear of the part or parts contiguous to each other. From the appearance of the arm when closed, while I do not find a perfect mechanical fit between the breech-pin and the barrel, I should class it among what I have denominated tight-breech guns."

Under the proper definition of an open joint, which is a joint having "a sensible or distinct space between the rear end of the barrel in which the cartridge is placed, and the forward end of a breech block," the

Smith & Wesson gun of 1854 did not have an open joint, but it did not have the tight joint of preceding inventors, who relied upon tightness to prevent the escape of gas. The inventors could not have expected that its joint was to be efficient for that purpose. It used a cartridge similar to those used in the saloon arms of Flobert and Pryse & Redman. The breech was sealed, and the escape of gas was prevented, by the exploded cartridge which was carried outward with the barrel at the time of the explosion, and thereby preserved a gas-tight joint. The cartridge, when inserted in the gun, made a substantial mechanical fit between itself and the cylindrical part of the chamber. It had the same capacity for sealing the joint as the modern cartridges have, but it was not called upon to expand, and, by its expansion, bridge over an open space, as is the case with cartridges now used, which, when inserted, do not quite fill the walls of the barrel. In its firing mechanism it was an improvement upon the Pryse & Redman pistol, and was, to a certain extent, its successor. The blow of an independent hammer was delivered upon the rear end of its breech piece, which was brought behind the cartridge, and was then driven forward by this blow.

The Morse gun has a breech block which is moved forward, and forces the cartridge to its place in the chamber of the gun, and remains firmly there while the cartridge is fired by a separate organization.

The gun of the defendant is made under the Smith & Wesson patents of 1854, and the B. Tyler Henry improvements thereon, patented in 1860.

Mr. Morse, the patentee, had bestowed study and thought upon the subject of breech-loading guns, and in 1856, while looking at a minie-ball, conceived the idea of making a breech-loading military gun, which would be sealed at the breech solely by the expansion of the cartridge, upon the principle of the expansion of the minie-ball at its base or rear end. He then invented a flanged center fire, side-flanged, yielding metallic cartridge, which was patented by letters patent No. 15,996. This was so important a part of his invention that I quote the claim of the patent, as follows:

"The combination and arrangement of the cartridge case as constructed, with the priming apparatus as constructed, or their equivalents, whereby I effect the entire exclusion of any and all escape of the gas produced by the combustion of the powder of the cartridge and priming, except by the one channel—the bore of the barrel of the gun—the breech joints and priming vent being thereby so effectually sealed and closed that no air can escape at these parts of the gun after the charge is fired, until the cartridge case is withdrawn from the bore, although air blown at the muzzle before firing the charge might escape through these joints, as it would in the cases above referred to."

He also invented a gun in which the patented cartridge or a similar cartridge was to be used, and which is the subject of the patent in suit. The two claims which are involved in this case refer only to the open joint at the breech and to the cartridge extractor.

Excluding for the present any consideration of the extractor, the invention, as a whole, consisted in an efficient military breech-loading gun,

whose breech is movable with relation to the barrel, purposely intended to make, by means of a somewhat loosely fitting, yielding, or elastic cartridge case, a loose or open joint tight. between the chamber of the barrel and the breech block, the breech block not acting as a hammer, but being combined with a firing-pin which communicated the blow of the hammer to the priming of the cartridge. His cartridge case was adapted to his gun, but the gun patent was properly not limited to the precise construction of the cartridge case which he adopted. Although the ideas of the patentee in regard to the open joint are expressed at length in his original application for the patent, they are briefly expressed, in the patent as granted, as follows:

"My gun is so constructed that before loading it I can blow through it or run water through it with facility, but, when the charge is in, it becomes comparatively air and water tight, because I use a cartridge case which seals the breech joint both as to powder and the priming."

The specification further says:

"The barrel face, M, of the breech piece is cupped by a rim, N, portions being cut out for the nipper jaws to drop in and clasp the cartridge. This rim projects without contact into the chamber, O, Fig. 14."

The first claim of the patent in suit, and the only one in regard to the open joint, is as follows:

"Inserting the rim, N, or its equivalent without contact into the chamber, O, substantially in the manner and for the purpose described, contact being obtained through the medium of the cartridge case."

The rim, N, is an annular rim or tongue which enters without contact into a corresponding annular groove in the rear end of the barrel, which is the chamber, O.

The defendant's gun, now known as the "Winchester Repeating Gun," has an open joint. The face of the breech block is flat, and there is a perceptible space between it, when advanced to its extreme forward point, and the rear end of the barrel. It has no cupped rim, N, and no grooved chamber, O. It has a chamber, for the vacant space in the rear end of the barrel behind the cartridge, when it is in its seat, is a chamber. The forward end of the breech piece, when pushed forward, stops somewhat short of the rear end of the barrel.

Unless an unnaturally broad construction is given to the claim, there is no infringement. The defendant's gun does not have the rim, N, nor the chamber, O, of the patent, and the rim of its breech block is not inserted into the rear end of the barrel. If the scope of the patent is to be, as it must be, limited by the invention which is expressed and described in the claim, the defendant's gun is not included in the grant.

But the complainant insists that, inasmuch as Mr. Morse was the original inventor of the open joint in military arms, and inasmuch as the system which he introduced has worked a revolution in that art, the claim should not be limited to the precise mechanism, but should be construed to include a breech-loading gun in which there is a space between the forward end of the breech block and the end of the barrel,

designedly left to secure freedom of motion of the parts, contact being obtained by the expansion of a loosely fitting cartridge case.

It is, I think, undoubtedly true that the Morse gun, as a whole, was of great public benefit. The gun and cartridge were brought to the attention of the United States government, and the ordnance board, convened in 1858, for the selection of a plan of altering old arms to breechloaders, selected or recommended the gun for the reason that it contained "the new and untried principle of a primed metallic cartridge case" which might be found useful. One hundred guns were made for private use. The right to alter 2,000 old arms, in accordance with the patent, and the right to make 1,000 new carbines were sold to the United States government. The war of the Rebellion followed in 1861, during which the United States army was provided with breech-loading arms only to a limited extent, but, during the progress of the war, invention in fire-arms was greatly stimulated, and after the close of hostilities, the subject received earnest attention from the government. About 1866, it began the manufacture of military breech-loading arms which contained the peculiarities which are found in the Morse gun; that is to say, quoting the language of Mr. V. D. Stockbridge, to whom I have before referred, and who was for many years examiner or assistant examiner in the patent-office in the class relating to fire-arms, and an acknowledged authority upon that subject:

"A fire-arm having a movable breech block which was not intended to make a tight joint by contact of its parts between the rear end of the barrel and said breech block, but which was to have its joint between them sealed through the medium of a yielding cartridge case and breech block having a firing-pin passing therethrough, a taper in the barrel tapered in connection with a means for extraction, a center-fire or center-primed cartridge, an extractor which would throw the cartridge clear out of the gun,—all these were and are embraced in the arm made by the government. This may be said to be the beginning of the general manufacture in this country, and in the world, of fire-arms embracing all of these essential characteristics."

Assuming that the plaintiff's construction is correct, and that the claim is for a breech-loading gun in which the parts are constructed on the plan of not attempting to seal the breech by the contact of these parts with each other, the sealing of the breech being effected by the use of any properly organized cartridge shell, the question upon this part of the case is whether the claim, upon this broad construction, can be sustained, in view of the prior art. Obviously it cannot, if the term "breech block" includes a device which performs in some degree the function of a breech block, although it is also a hammer. It should be conceded that the Pryse & Redman breech block, not being a mechanism which presses the cartridge to its seat and holds it there to receive the blow of a hammer, is not a breech block which is capable of being used in a military arm, and, therefore, is not the breech block of the Morse gun.

The question is thus narrowed to this: Whether in view of the pre-existing art as shown in the Smith & Wesson gun, a sweeping claim for any open joint between a distinctive breech block and the barrel, irrespective of any other mechanism, is to be sustained. The Pryse & Red-

man pistol had an open joint. The Smith & Wesson gun took the Pryse & Redman cartridge and substituted for its combined hammer and breech piece a breech piece which was moved forward to the rear end of the cartridge by toggle-joints, and a hammer which struck its blow upon the rear end of the breech piece. The pressure of the breech piece, and the blow of the hammer against it, forced the metal or rims of the cartridge into the recess upon the front end of the breech piece. The intention was to cause the breech piece to hold the cartridge with sufficient power to enable it to be drawn out of the barrel by the withdrawal of the breech piece.

Smith & Wesson changed the Pryse & Redman hammer into a substantial breech block, and in so doing made a closer joint. In their gun there was not the intentional open joint which has become conspicuous in modern guns, but the line of demarkation between the width of its joint and of the open joints of the Morse and other guns is a narrow one. A trifling variation in the length of the breech-pin makes the successors of Smith & Wesson infringe. Upon the plaintiff's construction, if technicalities are to be observed, they do infringe, and all breech-loading guns which have cut off a little from the end of the Smith & Wesson breech block must pay royalty to the owners of the Morse patent; but, even if the patent had clearly declared that this was its scope, I should reluctantly have come to the conclusion that, irrespective of any other mechanism, a mere widening of the Smith & Wesson joint was an infringement. But when the patent has avoided such a declaration of invention, and placed its claim upon much narrower grounds, there is no necessity of considering what would be the result if the patent had been as broad as the plaintiff would construe it to be.

The second and only remaining claim which is in controversy, relates to the extracting mechanism, and is as follows: "I claim the nippers, S, and the mode of operating them by the pins, r, r, and the shoulders, 7, on the hammer or equivalents therefor."

The idea of the extractor, which is called the "nippers, S," was taken from the jaws or clamps of a pile-driver, and, like the pile-driver device, the nippers had two forward ends moving towards or away from each other, and two rear ends moving towards or away from each other. They are pivoted to the breech bolt, are capable of moving in radial lines, the forward ends are "moved towards or away from each other by two sets of projections, one of which pushes the forward ends towards each other, and the other the rear ends towards each other, thus spreading the forward ends apart, as the nippers are moved back and forth with the breech bolt." One of these sets is called in the patent "the pins, r, r," and the other is called "the shoulders, 7." The mode of operation of the nippers is as follows: The gun being unloaded, a cartridge is shoved into the barrel, when the lever is shut down, which shoves the breech block forward against the rear end of the cartridge, the breech block carrying the nippers beyond the flange of the cartridge. The trigger is then pulled, releasing the hammer, which strikes the firing-pin, the shoulders upon the sides of the hammer at the same time striking against the rear ends

of the nippers and causing their front ends to swing in and engage with the cartridge flange. After the gun has been fired, the lever is raised and draws back the breech block, which forces the hammer back to full cock; the nippers, as they are also drawn back, strike against the pins, $r$, $r$, and swing outward at their front end and let go of the cartridge shell.

The Winchester extractor is a spring-hook, rigidly attached to the breech piece, which, as the breech is closed, rides over the flange of the cartridge and automatically engages therewith, making a latch connection; there is also a rigid stud on the other side of the breech block, which passes underneath the cartridge as the breech is closed; as the breech is opened, the extractor hook draws the cartridge back until it is out of the chamber, at which time it is held between the spring-hook and the rigid stud, when the carrier block coming up from below hits the shell and throws it clear from the gun, being assisted also by the spring of the extractor hook. It is not claimed that the defendant's gun has the pins, $r$, $r$, or the shoulders, 7, but it is contended that the second claim embraces two claims, one for the nippers, S, moving radially, irrespective of the mechanism by which radial motion is imparted; and the other for the particular means by which motion is imparted, and that as Morse's invention was the first one that consisted of a hook having radial motion and attached to the movable breech block, any extracting hooks which are attached to the breech block and move radially infringe his patent. I cannot accede to this broad construction, which is altogether too sweeping in its character, and would include any radially moving hooks which are attached to the breech block, although they may operate or be operated upon by means very different from the method by which the nippers, S, are made effective. Mr. Morse did not invent any and all radial hooks; he did invent the nippers, S, and radial hooks operating in substantially the same way. The claim is twofold and includes the nippers, S, and any equivalent mechanism which is attached to the breech block, and withdraws the cartridge in substantially the same way as do the nippers, S. The second branch of the claim is for the mechanism of the patent and its equivalent. The extracting device of the defendant is a spring-hook, one end of which is rigidly attached to the breech piece, the hook portion having an inclined or beveled face. As the breech piece moves forward, this end strikes against and rides over the edge of the cartridge flange, and makes a latch-like connection with it. When the breech block is withdrawn, the hook pulls the cartridge shell, which is held between the hook and the stud, backward, until the carrier block tips up the front end of the shell, and thereby releases it from the hook. This is an altogether different mode of operation from that of the two opening and closing forward ends of the Morse nippers. These two hooks, having been pushed forward with the forward movement of the breech block, and not having engaged with the cartridge flange, are brought by another movement over the flange, then are moved backward and by another movement are spread apart, and the cartridge is released.

The Winchester extractor is pushed forward and by its forward movement rides over the flange of the cartridge, is then drawn back, and does not release the empty cartridge until it is disengaged by the carrier block.

The different principle upon which these two devices operate has been heretofore judicially stated in this circuit. Judge BLATCHFORD, in *Renwick* v. *Cooper*, 10 Blatchf. 201, when comparing the extractor patented by William C. Hicks, March 10, 1857, with the Morse extractor, says:

"It is also an essential point in Hicks' arrangement that the closing of the breech effects the engagement of the hook. Therefore a single movement of the hand, to close the breech, is all that is required. In the Morse patent, the forward movement of the breech closing piece causes no engagement of any hook with the cartridge flange, and there is no such engagement until the hammer is brought into action, by a second movement of the hand, to act on the tails of the hooks to cause such engagement, after the forward ends of the hooks are moved forward by the breech closing piece."

This language is equally applicable in a comparison of the Winchester and Morse extractors. The Winchester extractor is a modification of the Hicks device. *Renwick* v. *Pond*, 10 Blatchf. 39. His extractor was a rigid hook inclined upon its front face and projecting forward from the center of the breech piece, so as to strike the edge of the circular hole in the cap of the cartridge, when the breech piece was moved forward. The elastic edge of the brass disk of the cap engaged with the bill of the hook, and the cartridge was drawn back by the backward movement of the breech piece. The fact that the Winchester extractor is a spring-hook, and therefore acting radially and engages with the outside flange of the cartridge, does not bring it within the Morse invention, because the mode of operation of the two devices is not alike.

The complainant's bill sets forth an agreement, dated August 21, 1872, between the owners of the Morse patent and the defendant, whereby, as it is alleged, the defendant, by way of settlement and compromise of the claim of the said owners against the defendant for damages for its infringement of said patent, agreed to pay and did pay the sum of $10,-000 in cash, and gave said owners its note for the further sum of $15,-000, which money and note, when paid, were to be in full settlement and discharge of said claim for damages for infringements committed before October 28, 1870; but if said note was not paid according to the terms of said agreement, then the defendant should be held liable for said damages, and further alleges the non-payment of said note.

The defendant's cross-bill relates to said written agreement and prays for a cancellation thereof, a repayment of said $10,000, and an injunction against any attempt to collect said note upon the grounds hereafter set forth. The facts in regard to said contract are as follows: On June 8, 1872, in the suit of *Renwick* v. *Pond*, who was the selling agent of the Winchester Arms Company, upon the Hicks extractor patent, a decree was entered by the circuit court for the Southern district of New York, in favor of the validity of said patent. The court said in its opinion that Hicks' invention "dates back to a period shortly after the four-

teenth of August, 1855, and anterior to the date of the invention shown in the Morse patent." A suit upon the Hicks patent against the defendant in Connecticut was apparently imminent, which it feared would result in an injunction against the use of its extractor. About the same time, a suit upon the same patent, and a motion for a preliminary injunction, was brought by Renwick against Albert Cooper, in the Southern district of New York. This suit was also defended by the Winchester Arms Company. A deliverance from the threatened injunction in Connecticut was deemed of great importance by W. W. Winchester, the vice-president of the company. The president was then in Turkey, making arrangements for a large contract for arms with the Ottoman government.

In June, 1872, Mr. Morse was applying for an extension of his patent before the patent-office, and was being opposed by the Winchester Company. About the time that the decision was rendered in the *Pond Case*, Mr. Morse informed Mr. Dodge, the attorney of the Winchester company in the patent-office controversy, that he, Morse, could furnish oral and documentary proof that his gun, which was patented October 28, 1856, was invented before August 14, 1855, and that the documentary proof was contained in a *caveat* which he had filed before his application. Mr. Dodge informed the Winchester company of these statements. Subsequently, the negotiations on the part of the owners of the Morse patent were conducted by James A. Skilton, Esq., as their attorney, and by Mr. W. W. Winchester, and by different gentlemen at different interviews in behalf of his company, and culminated in a written contract, dated August 21, 1872, of which the following is a copy:

"Whereas, letters patent of the United States of America were granted unto George W. Morse, now of Greenville, South Carolina, for improvements in breech-loading fire-arms, bearing date October 28, 1856, and numbered 15,995, which letters patent are now owned by the said Morse and others, for whom James A. Skilton, of New York, hereinafter mentioned, is duly authorized and empowered, as their attorney in fact, to act in all matters covered by this agreement; and whereas, the Winchester Repeating Arms Company have made and sold fire-arms which are claimed to contain a substantial and material part of the invention secured by said letters patent, and to infringe the same; and said company is desirous of settling for said claimed infringement upon being furnished with satisfactory evidence that said Morse is the first inventor of said improvements in fire-arms, and especially that the said Morse prepared caveat papers describing the same, which were signed and certified to before the alleged invention of one William C. Hicks, to whom letters patent of the United States of America have also been issued, and thereafter reissued, bearing date March 1, 1870: now, therefore, for the purpose of effectuating such settlement, it is by said parties mutually agreed, the agreements of each being in consideration and on condition of the agreements of the other:

"*First.* That the said Winchester Repeating Arms Company will pay to said Skilton, for said owners of said letters patent, on the due execution of this agreement, the sum of five thousand dollars ($5,000) in cash, and the further sum of five thousand dollars ($5,000) in cash upon the delivery of the papers and affidavits, hereinafter mentioned, to the said Winchester Repeat-

ing Arms Company, and will execute their promissory note for the further sum of fifteen thousand dollars ($15,000,) payable to said Skilton, as said attorney, or order, on demand, which note is to be placed for safe-keeping and to be delivered as hereinafter provided, in the third article of this agreement.

"*Second.* The said owners of said letters patent, and the said Skilton agree to deliver to said Winchester Repeating Arms Company, or their attorneys, on or before the twenty-seventh day of August, 1872, a duly authenticated copy of the caveat specification, petition, drawing, and certificate of authentication hitherto exhibited to Chas. M. Keller, Esq., of New York, the originals of which are on file in the patent-office in Washington, D. C., together with the affidavit of the said Morse showing and declaring that his said improvements were invented before the fourteenth day of August, 1855. And upon the rehearing sought to be had in the case of *Renwick* v. *Pond*, will furnish such other evidence, documentary or otherwise, as may be in their possession, or as it may be in their power to furnish or discover to said Winchester Repeating Arms Company, or their attorneys, of the priority of said invention to the alleged invention of William C. Hicks before mentioned. All necessary expenses of witnesses and expenses attending the taking of testimony to be defrayed by the Winchester Repeating Arms Company.

"*Third.* The promissory note hereinbefore provided to be executed, in the matter of this agreement, it is mutually agreed shall be deposited with a safe deposit company in the city of New York, to be hereinafter designated by C. M. Keller and J. A. Skilton, hereinafter mentioned, for safe-keeping, to be delivered to said Skilton, as said attorney, whenever, and not before, on a motion for a rehearing in the case of *Renwick* v. *Pond*, now pending in the United States circuit court for the Southern district of New York, or in any other proceeding instituted for the purpose, it shall be decided by said court to grant said rehearing; it being, however, understood that if said motion or proceeding shall be dismissed or fail, on grounds not involving the question of priority of invention between said Morse and said Hicks, said note shall, notwithstanding, be delivered to said Skilton, provided the first-mentioned evidence of the priority of said Morse's invention, to-wit, the caveat papers hitherto seen by C. M. Keller, and the affidavits of the said Morse setting forth the required facts, has been furnished to said Winchester Repeating Arms Company, as stipulated herein.    And said note shall be delivered by said safe deposit company to the said Skilton, upon the joint request of Chas. M. Keller and Jas. A. Skilton; and in case of their disagreement as to the fulfillment of this agreement, and the occurrence of the contingency herein provided, to warrant the delivery of the same, then, upon the request of an umpire or third party to be selected by them, said request to be in writing.

"*Fourth.* It is further mutually agreed that, upon the payment of said promissory note, the said Winchester Repeating Arms Company is to be held released and discharged from all claims or damages for the use of said Morse's improvements, as claimed in the specification of his letters patent, dated October 28, 1856, and numbered 15,995, previous to October 28, 1870, in the manufacture and sale of the Henry and Winchester Repeating Arms, and a release and discharge therefrom in writing is to be executed by said owners and said Skilton, if demanded by said Winchester Repeating Arms Company. And in case said note shall not be delivered and paid according to the terms of this agreement, then said company shall be held liable therefor.

"*Fifth.* The said Winchester Repeating Arms Company agree not to oppose the application for extension of the letters patent, aforesaid, granted to said Morse, now pending before the commissioner of patents.

"*Sixth.* And it is mutually agreed by and between the parties hereto, that nothing whatever in this agreement shall bind or in any way obligate the said

Morse, and the lawful owners of the said letters patent, to grant to the said Winchester Repeating Arms Company any license or permit of any kind to make said arms or use said invention of the said Morse, under any extension of said letters patent that may be obtained hereafter; or in any way set, name, or limit the amount of royalty per gun to be paid by the said Winchester Repeating Arms Company, in case such license shall be hereafter granted under such extended letters patent, but the same shall be entirely at the option of the said Morse, his assigns and representatives."

In these negotiations Mr. Skilton also represented that the *caveat* would show that the extractor described in the Morse patent was invented before August 14, 1855. It had been verbally agreed about August 14, 1872, that Charles M. Keller, Esq., the senior counsel of the Winchester company, should see the *caveat* of Mr. Morse, which it was represented was filed in August, 1855, and should advise his client as to its value in antedating Hicks' invention, and it was verbally agreed that in case the evidence from the *caveat* should be satisfactory to Mr. Keller, $24,000 should be paid to the owners of the Morse patent. On August 16, 1872, Mr. Keller and Mr. Skilton met in Washington, in the office of Mr. McIntire, a patent solicitor, and were about going to the patent-office to see the *caveat*. A violent shower had sprung up, Mr. Keller's health was infirm, and Mr. Skilton suggested that he examine a certified copy, which he, Mr. Skilton, had in his pocket, and which had been certified on that or on the previous day. As a matter of fact, the *caveat* could not then have been found in the patent-office if Mr. Keller had visited the office, for it was not at that time in its proper place. The certified copy, being a copy of the petition of Mr. Morse for leave to file a *caveat*, dated August 13, 1855, and of the oath appended thereto, of the original description of the invention filed with the said petition and of two sheets of drawings each plainly marked "Filed August 24, 1855," and of the papers which were filed on October 25, 1855, being an additional description of the invention as exhibited in the second sheet of drawings, and of the letters of Mr. Morse and his attorney, Mr. Clinton, was produced and shown to Mr. Keller. The second sheet of drawings was filed October 25, 1855, with an additional description of the invention as therein exhibited. Nothing appeared upon the face of the second sheet to show that it was not filed August 24, 1855, but it positively asserted that it was so filed. The description filed on August 24th speaks in a very general way of a "catch, F," to withdraw the cartridge, and the drawing then filed has a catch, F, but no such description is given, either by writing or in the drawing, as to enable a skilled mechanic to make a practical extractor. The drawing of the catch is vague. The second sheet and the written description filed October 25th show clearly the extractor, which subsequently appeared in the patent as the "nippers, S." With both drawings in sight, and upon the supposition that they were filed at the same time, the catch, F, might be thought to be an imperfect side view of the nippers, S. Mr. Keller examined the two drawings, and the description attached to the petition for a *caveat*, and said, "I am satisfied; give me copies of these two drawings and specifications with the petition and oath," and wrote Mr. Winchester the following letter:

"WASHINGTON, D. C., August 16, 1872.

"*W. W. Winchester*, *Esq.*—MY DEAR SIR: I have examined the Morse *caveat* of August, 1855, and find that it describes and represents the hooks for extracting and discharging the cartridge if not fired or the remnants if fired, and that the description and representation is as full as in the patent afterwards granted. In my opinion, this *caveat*, with the affidavit of Mr. Morse, will be sufficient for the reopening of the case of Renwick *versus* Pond, and to defeat the Hicks patent.

"Yours, truly,                         CHARLES M. KELLER."

On August 21, 1872, when the written contract heretofore recited was signed, $5,000 were paid to Mr. Skilton, on August 27, 1872, a certified copy of the original petition for leave to file a *caveat* of the specification, and of the two sheets of drawings, both marked "Filed, August 24, 1855," was delivered to Keller and Blake, and another $5,000 were paid to Mr. Skilton, and on August 28, 1872, the note in controversy for $15,000 was delivered to him, and was deposited in a trust company, as provided in said contract, where it still remains, having never been redelivered to Mr. Skilton. The note and contract were assigned to the complainant on July 2, 1875.

Upon the hearing of the motion for preliminary injunction in *Renwick* v. *Cooper*, those papers with an affidavit of Mr. Morse as to the date of his invention of the extractor, and an affidavit of an expert, were presented to the court by the defense. Judge BLATCHFORD said in his opinion that the certified copy contained a description and two drawings, that the second drawing was not referred to in the description, and held that the description and first drawing suggested the withdrawal of a cartridge by a catch, but contained no description or representation sufficient to enable a practical working apparatus to be made from them; that the plan in the second drawing was a different one from that suggested in the first drawing, and did not embody any one of the inventions covered by the first three claims of the Hicks patent. Mr. O. F. Winchester, the president of the defendant company, in November, or December, 1872, refused to pay the note, upon the ground that his son had been deceived by Mr. Skilton.

The cross-bill alleges as follows:

"And complainants further show unto your honors that the pretended copy of the said *caveat* of said Morse, delivered to complainants by said Skilton, as aforesaid, was not a true copy of said *caveat*, but was a false and altered copy of a *caveat* filed by said Morse in the United States patent-office, on the twenty-fourth day of August, A. D. 1855, and contained only a part of the specification of said *caveat*, with additions and alterations. And complainants charge that said additions and alterations were made by said Skilton, or by his procurement, with the intent to obtain the payment to said Morse, Cole, Lambert, and Skilton, and to said Morse Arms Manufacturing Company, by the complainants, of the said sum of $10,000, and the execution by the complainants of the said note for $15,000. And the complainants paid said $10,-000, and executed said note, solely in consideration of the delivery to them of the false and fraudulent copy of said pretended *caveat*."

I have given only a very general history of the transaction, and have not attempted to state the various interviews of the parties and their rep-

resentatives, the disappearances and reappearances of the *caveat* in the patent-office, and the different circumstances which are relied upon to give color to the opposing theories of the counsel.

The prominent facts are the following: Mr. Skilton represented and believed that the extractor shown in the patent was shown in the *caveat* filed on August 24, 1855. The written contract was based upon the representation and belief that evidence was furnished by the *caveat* that Morse made the invention described in the patent before August 14, 1855, and this opinion was founded upon Mr. Keller's letter. The only reason which induced the Winchester company to enter into the contract, was to obtain evidence which would destroy Hicks' patent. Mr. Skilton was not desirous to appear to sell testimony, and was desirous to place the payment upon the ground of the settlement of a claim for damages for infringement, and, therefore, the contract was so drawn. The copy of the *caveat* which was shown to Mr. Keller represented, through the fault of the patent-office and not through any fraud of Mr. Skilton, that the second sheet of drawings, which alone contained the invention as it was subsequently described in the patent, was filed August 24, 1855. This mistake led Mr. Keller to say in his letter that the *caveat* of August, 1855, represents the hooks, and that the representation is as full as in the patent afterwards granted, and led him into the mistaken belief that the nippers, S, were invented before August 24, 1855, which a more careful study and conversation with Mr. Morse might have corrected. I am by no means certain that this mistake did not compel Mr. Keller to give the opinion which cost the Winchester Company $10,000, and its note for $15,000, but I am impressed with the belief that if Mr. Keller had been in his customary health, and had given to the *caveat* the time, and study, and inquiry which the importance of the subject would have justified, such examination would have disclosed to him that the written description referred only to the first sheet of drawings, that no reference was made to the second sheet, and that the catch, F, was a different thing and upon a different plan from the two catches in the second sheet. A more accurate and thorough investigation of the caveat papers, which were before him, especially of the papers which were known to have been filed in October, would have shown that the two catches were not shown in the description filed in August, and that they were only referred to in the description filed in October, and he might have learned that the second sheet was not filed in August. I do not find that he was guilty of laches, because the mistake of the patent-office so misled him that he gave the papers a less exhaustive examination than he otherwise would have done.

Although the Morse Arms Company was nominally formed on July 25, 1872, I cannot find substantial evidence that any portion of the $10,000 cash payment was ever paid to, or became a part of, the assets of said corporation, and both from the testimony and from the allegations of the bill, I think that none of said money was ever delivered to said corporation. The note is thus the only thing of practical importance which is involved in the cross-bill, for the provision in the contract that in case

the note should not be paid the Winchester company should be held liable for infringements, is not, in view of the whole contract, an admission of liability, but is an agreement that, in the event of non-payment of the note, the rights of the Morse Arms Company in regard to infringements should remain as they were.

Upon the finding of facts, the question is whether relief should be given in consequence of the mistake in regard to a material fact, viz., the time when the second sheet of drawings was filed, for the allegations of the bill in regard to fraud upon the part of Mr. Skilton are found not to be true.

The result of the protracted attention which I have given to this part of the case may be briefly stated as follows: The note was given under a mistake of material facts, and upon the foundation of that mistake, although Mr. Keller had at hand the means of knowledge from which the discovery of the mistake could have been made. The defense arising from these facts is as fully open and available to the Winchester company in an action at law as in a bill in equity. 1 Story, Eq. Jur. § 146, note 2; *Kelly* v. *Solari*, 9 Mees. & W. 54; *Bell* v. *Gardiner*, 4 Mann. & G. 11; *Townsend* v. *Crowdy*, 8 C. B. (N. S.) 477. That being the case, I am not satisfied that it is expedient to render an affirmative decree upon this cross-bill, but, upon the other hand, to leave the liability of the Winchester company upon the note to an action at law. *Hamilton* v. *Cummings*, 1 Johns. Ch. 517; *Insurance Co.* v. *Stanchfield*, 1 Dill. 424. The cancellation of an "executed contract is an exertion of the most extraordinary power of a court of equity," (*Atlantic De Laine Co.* v. *James*, 94 U. S. 207;) and, as the defense to the note is open to the Winchester company hereafter, I have determined to dismiss the bill without prejudice to the right of the company to interpose its defenses in any action which may be brought, except the defense of fraud.

Let there be a decree that the bill and the cross-bill are each dismissed, the latter without prejudice to the extent hereinbefore stated.