TREAT v. RUSSELL et ux.

(Circuit Court of Appeals, Eighth Circuit. February 27, 1904.)

No. 1,910.

1. CANCELLATION OF DEED—FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence considered, and held insufficient to warrant the cancellation of a deed conveying an undivided interest in a tract of land for fraud, under the rule that in such cases the proof of fraud must be clear, satisfactory, and convincing, where complainants admitted their signatures to the deed, which was formally executed and acknowledged, duly recorded, and remained unchallenged for more than four years, during all of which time the conduct of the parties was consistent with a joint ownership of the land, and in some respects inconsistent with its sole ownership by complainants.

Appeal from the Circuit Court of the United States for the Western District of Missouri.

This action was brought by James M. Russell and Minnie A. Russell, his wife, who are the appellees in this court, against Thomas O. Treat, the appellant, to cancel and annul a deed conveying a two-thirds interest in a tract of land situated in Platte county, Mo., containing altogether about 340 acres.

The deed in question purported to be one executed by the appellees, as grantors, in favor of the appellant, as grantee, on April 4, 1896, and to have been acknowledged on the same day before Thomas A. Moxcey, a notary public, and to have been duly recorded in the proper office on May 27, 1896. The appellees, hereafter termed the "complainants," sought to have this deed canceled and annulled, because, as they alleged in their bill, they never did at any time sell or convey, or undertake to sell or convey, to the appellant, hereafter termed the "defendant," an undivided two-thirds interest in the land in controversy. They averred that if the complainants, or either of them, ever appended their signature to the deed in question they were induced to do so by some scheme, trick, device, or fraud which the defendant practiced to obtain such signatures, which scheme, trick, device, or fraud, as they alleged, they could not define or describe otherwise than by saying that the defendant had presented to them the deed in question and had induced them to sign it by representing to them that it was an instrument other and different from the pretended deed, doing so with intent to deceive and to defraud them. They further averred that the defendant signed, or caused some other person to sign, their names to the deed without their knowledge or consent. After the foregoing allegations the complainants alleged that they did not know in which of the two ways last mentioned the signatures of the complainants appearing on the deed had been secured, but that they were secured in one or the other of these ways, and, as they believed, in the latter way; that is to say, by forgery. The defendant answered the bill by denying each and all of the foregoing charges of fraud and forgery. He further alleged that James M. Russell, one of the appellees, acquired a title to the tract of land in controversy in the month of January, 1896; that the conveyance of the title to said Russell was made pursuant to a prior agreement between Russell and one Clark W. Drummond, who was at the time a partner of Treat, whereby said Russell, Drummond, and the defendant, Treat, had mutually agreed to purchase the land from the former owner on joint account, each of the purchasers to have an undivided one-third interest therein; that pursuant to said agreement the title to the land, when purchased, was vested in Russell temporarily, the understanding being that he would convey to each of his associates an undivided one-third interest therein when requested to do so; that under said agreement for the purchase of the land in question the defendant and said Drummond conducted all of the negotiations leading up to the purchase of the land from the former owner, and also negotiated a loan secured by a mortgage on the land, whereby the purchase price was paid; that when the purchase was consummated the conveyance was made to Russell pursuant to the aforesaid agreement; that subsequently the defendant acquired Drummond's one-third interest in the property, and that on April 4, 1896, Russell and wife conveyed to the defendant a two-thirds interest in the land, as he had previously undertaken to do; that this deed was duly acknowledged and recorded, and is the identical instrument which the complainants charge to have been obtained from them by means of fraud or forgery. The defendant also filed a cross-bill seeking an accounting as between himself and the complainants respecting the land and their dealings in connection therewith and certain affirmative relief. The case was removed from the state court, where the bill was originally filed, and after its removal to the federal Circuit Court was referred to a special master to take the testimony, who was also empowered to "examine the evidence and make findings of fact." The master subsequently filed a report, in which he found adversely to the complainants as respects all the charges of fraud and forgery. Exceptions having been filed to this report, the Circuit Court reversed the findings of the master, holding that the deed in question had been obtained fraudulently and deceitfully, and in accordance with that finding it canceled and annulled the conveyance. The case is before this court on an appeal taken by the defendant from such decree.

C. A. Mosman (Thomas F. Ryan and S. K. Woodworth, on the brief), for appellant.

James W. Boyd, for appellees.

Before SANBORN, THAYER, and HOOK, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The allegation which is contained in the bill that the signatures of the complainants to the deed of date April 4, 1896, which the complainants seek to have canceled, were forged—that is to say, that they were written by the defendant himself, or by some one else whom he had caused or procured to write them, without the knowledge or consent of the complainants—may be ignored, since the complainants, in the course of the trial, practically admitted that the deed bore their genuine signatures when it was exhibited to them, although they professed ignorance as to the manner in which their signatures had been obtained, and also stoutly denied that they had ever consciously signed the deed in question intending to convey to the defendant a two-thirds interest in the land in controversy. Both of the complainants gave evidence tending to show that on one occasion, on or about March 10, 1896, at the request of the defendant, they had appended their names to an instrument of which they could give no better description than that it was "a blank paper that had some printed matter on it, something in the form of a deed or something like that, the size of that paper there" (indicating the deed of April 4, 1896). According to their statements respecting this incident, they went to the defendant's office in Atchison, Kan., on or about March 10, 1896, to execute a deed of trust on the land in question to secure the payment of a note in the sum of $5,000, which was given to an insurance company for money borrowed to purchase the land from the former owner. After the deed of trust was signed, the defendant said (according to the complainants' testimony):

"Here, just sign this paper, and I can fill it out afterwards. You can go on to dinner. This does not amount to much anyhow, and I can fill it out afterwards. And we signed the paper, and started out of his office door, and he went out with us, and took a paper in his hand. I don't know what paper it was. And he carried it in, and turned on the left, and stopped at an office there—Mr. Solomon's office—and come on out, and we went on down the elevator together, and my wife and me went to dinner to a restaurant, and I don't think we went back in the office that evening. We went home."

The theory of the complainants, to account for their signatures to the deed of April 4, 1896, appears to be that this blank paper which they claim to have signed on the occasion in question without examination, and on the strength of the foregoing representation, was in fact the deed of date April 4, 1896, which they seek to have canceled, and that it was subsequently filled out by the defendant, and a certificate of acknowledgment appended thereto by the notary at the defendant's request, with intent on the defendant's part to defraud them. The charge that their signatures were forged being abandoned, and the fact being admitted that the deed bears their genuine signatures, there is no evidence in the record, so far as we can discover, that their signatures to the deed were obtained through any trick or artifice of a fraudulent character unless it be that on or about the date last mentioned the defendant did obtain their signatures to a blank deed in the manner last described with intent to perpetrate a fraud.

128 F.—54

This, then, would seem to be the principal question of fact in the case: Were the signatures of the complainants obtained to a blank instrument in virtue of a representation that it was of no consequence, or words to that effect? Unless this question is answered in the affirmative, it would seem that the genuine character of the deed has not been impeached, and that it cannot be annulled in virtue of any of the averments which are contained in the bill. Before considering this issue of fact, it is deemed advisable to state some general facts and circumstances, concerning which there is no controversy, which will serve to show the situation and relation of the parties to each other at and previous to March 10, 1896. The land in controversy originally belonged to and the title was vested in persons who resided in the state of Indiana. In 1890 or in 1891 Russell rented the land from the owners for agricultural purposes, and continued to reside on it as a tenant from that time forward until 1895 and thereafter until this action was brought. On or about August 3, 1895, he entered into an agreement with the owners of the land for its purchase at the price of $5,400 in the aggregate, or at the rate of $16 per acre. Of this sum $800 was to be paid in cash, and the balance in five equal annual installments, that were to be secured by a mortgage on the land. There was some delay in carrying out the agreement, and before the contract of sale was executed by the delivery of the deed Russell negotiated a sale of the land to one Smith at the price of $18 or $20 per acre. This agreement with Smith appears to have been made in the month of November, 1895. Smith was to pay the entire purchase price in cash. To enable him to buy the land, Smith tried to negotiate a loan through the defendant, Treat, and his partner, Drummond, who resided at Atchison, Kan., and were engaged in negotiating loans upon real property for a commission. An arrangement was entered into by Smith with Treat and Drummond in virtue of which they agreed to join with Smith in making the purchase. By the terms of this agreement the land, when conveyed, was to be deeded to Smith, who was to execute a mortgage upon the land for the purchase money, but the property, when bought, was to be held by him for the benefit of himself, his son, and Treat and Drummond, each to be entitled to an undivided one-third interest therein. This arrangement, however, with Smith, was not carried out, because Treat and Drummond failed to obtain a loan on the property for such a sum as was needed to pay for the property at the price of $20 per acre. Smith having failed to raise the money to purchase the land from Russell, Russell himself applied to Treat and Drummond to negotiate a loan on the property in the sum of $5,000 to enable him to carry out his contract for the purchase of the land which had not at that time been executed.

Up to this point there is no substantial controversy between the parties concerning any of the material facts, but here there is a conflict as to what occurred. Russell contends, in substance, that he never agreed with Treat and Drummond to purchase the land jointly with them, and that he simply employed them as brokers to negotiate a loan in his behalf, while Treat insists that when Russell applied to them to obtain a loan on the property in the sum of $5,000

he and his partner entered into a verbal agreement with Russell of substantially the same character as that which they had previously had with Smith, namely, that they would unite with him in purchasing the property on joint account, and would endeavor to raise the money wherewith to purchase the land by negotiating a sale of a mortgage on the property in the sum of $5,000, which mortgage should be executed by Russell. The defendant produced much testimony which tended to show that a verbal agreement substantially like that which is set forth above in the statement, was entered into between himself and Drummond on the one hand with Russell on the other for the joint purchase of the land, in pursuance of which a mortgage on the property was executed by Russell and negotiated by Treat and Drummond; that the purchase money to the amount of $5,000 was thus secured and paid to the former owner of the land; and that the property was thereupon conveyed to Russell in January, 1896, he agreeing to convey to Treat and Drummond an undivided two-thirds interest therein when requested to do so, which conveyance he and his wife subsequently executed and acknowledged on April 4, 1896.

Recurring to the principal issue of fact which is stated above, it is to be observed that no witness in the case besides the complainant and his wife gave testimony tending to show that either on March 10, 1896, or at any other date prior to April 4, 1896, they were requested by the defendant to sign a blank instrument resembling a deed, and that they did sign such an instrument pursuant to such request. This incident which the complainants relate, so far as the record discloses, was witnessed by no other person, and it is the only explanation which they seem able to give of the manner in which their genuine signatures to the deed of April 4, 1896, could have been obtained. The testimony of the defendant in relation to this incident is very positive, and to the effect that the only instrument which the complainants signed on March 10, 1896, was a deed of trust on the property in dispute securing the loan for $5,000, with which the property was purchased, and possibly an order directing how the money, when obtained, should be expended, and that neither on that occasion nor any other were the complainants requested to sign any blank paper resembling a deed or any other instrument. The defendant's testimony is equally positive to the effect that the deed of April 4, 1896, was signed and acknowledged on that day in his office, and not on March 10, 1896, both of the complainants being at the time present, and fully conscious of its contents and what they were doing. The defendant's statement in this latter respect is fully corroborated by the notary public before whom the deed of April 4, 1896, was acknowledged, who claims to have a distinct recollection of meeting both of the complainants in the defendant's office on that day, of their signing the deed in his presence and acknowledging it before him. The notary is himself corroborated by the official record of his proceedings on that day, which he was required to keep. This record shows the acknowledgment of the deed in question on April 4, 1896, and, while the notary was unable, on his examination, to say definitely whether he asked the complainants if they knew what was

in the deed, or told them what was in it, at the time he took their acknowledgment, yet that it was safe to say that he did the one thing or the other. Moreover, the presumption that the complainants were acquainted with the contents of the deed, and signed it with a full understanding of its contents, is created by the notarial certificate of acknowledgment, which presumption, if not conclusive, is entitled to great weight, the certificate being an official record, and it cannot be overcome at this late day without the clearest and most convincing evidence of fraud.

The record discloses other facts which support the contention of the defendant that the deed of April 4, 1896, was consciously executed by the complainants in pursuance of a verbal agreement made with Treat and Drummond prior to the negotiation of the loan for $5,000 that the land in controversy should be purchased on joint account, and that Treat and Drummond should have a two-thirds interest in the property when it was acquired. For more than four years subsequent to April 4, 1896, the defendant, Treat, frequently visited the land on which the complainants were residing, and conferred with Russell about the management of the place, the execution of leases for parts of the land, and other matters which would naturally interest one who had a proprietary interest in the property. He also advanced and paid interest on the outstanding loan when Russell was unable to do so, and also paid taxes upon the property when they became in arrear. The money so advanced by the defendant from time to time amounted to a sum exceeding $700. Russell never seems to have resented such interference with his affairs, but for several years conferred with the defendant freely, and accepted assistance and advice from him precisely as one would be expected to confer with and seek assistance from another who was interested with him in a joint venture. In a word, the actions of the parties subsequent to April 4, 1896, are consistent with the theory that the defendant had a proprietary interest in the property, and entirely inconsistent with the view that his interest was merely that of a broker who had once negotiated a mortgage on the land, and was only interested in seeing that the interest on the loan was paid, and that the mortgage was not foreclosed. Besides, on May 4, and again on May 13, 1901, after difficulties had arisen between the parties, the complainants entered into written agreements with the defendant concerning the future management and control of the land, which agreements almost in their opening paragraphs contained a recital to the following effect:

"That whereas the said parties hereto are owners, and have been for the past five years, of three hundred and forty acres of land situated in sections fourteen and fifteen and twenty-three in township fifty-four, range thirty-seven, Platte county, Missouri," etc.

On May 13, 1901, the complainants also executed a deed of trust covering the property in controversy to one Holbert to secure a note which they had executed in the sum of $335, in which deed of trust they described their interest in the land as being "an undivided one-third interest." Some time afterwards, and in the month of August, 1901, complainant and his wife also entered into an agree-

ment with the defendant for the arbitration of certain differences which had arisen between them, and which seem to have grown in part out of the contract of May 13, 1901, heretofore mentioned. This agreement of arbitration also begins with the following recital, to wit:

"Whereas T. C. Treat is and has been for more than five years past the owner of an undivided two-thirds interest in three hundred and forty acres of land in sections fourteen, fifteen and twenty-three in township fifty-four, range thirty-seven, Platte county, Missouri, and J. M. Russell is the owner of the undivided one-third thereof. * * * now, therefore, it is agreed that S. J. Blythe, John Page and William Reece be and they are hereby appointed and agreed upon to go through the accounts of each and both of said parties," etc.

The complainants say, in substance, that they signed these several written documents, being at the time ignorant or unconscious of the recitals which they contained, and with respect to the contract of May 13, 1901, containing the above-quoted recital as to the ownership of the land, they allege that their signatures thereto were obtained by the false representation of the defendant that it was merely a mortgage on the crops and produce of the land, given to secure the payment of the sum of about $700, which the complainants admit that they then owed to the defendant for money theretofore advanced by him for their benefit in keeping down the interest on the mortgage. It is therefore urged in their behalf that, as they were not aware of the recitals, they do not serve to estop the complainants from denying that the defendant is a joint owner of the property, and that they should not even be regarded as admissions or evidence of such joint ownership. But we have not been able to adopt this view of the case. The complainants were able to read and write, and they seem to possess the average intelligence of persons in their station in life. They had full opportunity to read the instruments containing the aforesaid recitals before signing them, and, as certain disputes had already arisen between themselves and the defendant before the several documents were prepared for signature, we find ourselves wholly unable to credit the statement that they signed the instruments in question without being aware of the admissions which they contained. Moreover, even if we were able to believe that the several documents were signed by the complainants without reading them, and in ignorance of the recitals, yet the law would not excuse them for their negligence in signing written agreements of such importance as these appear to have been without taking the pains to read them and to ascertain what statements they contained and what obligations they imposed. Enough friction already existed between the parties when the documents were executed. Their relations at the time had become so far strained that the complainants should have read these several instruments carefully before executing them, and we feel constrained to believe that they did examine them, or at least that they had a fair understanding of their contents, before they executed them. No other conclusion than this seems to be admissible in view of all the facts and circumstances of the case.

In addition to the recitals last mentioned, the record also contains evidence of oral statements made to at least five different per-

sons at various times by the complainant Russell; which statements are in the nature of admissions that defendant was a joint owner of the land in controversy.

The learned judge of the trial court seems to have been largely influenced to his decision that the deed of April 4, 1896, was obtained fraudulently and deceitfully by the thought that the oral agreement in virtue of which the land was bought and in execution of which the deed was made and delivered was an unconscionable agreement, according to the testimony of the defendant, in that it imposed an excessive burden upon the complainant Russell, and that it ought not to be given effect for that reason. We entirely agree with the view that the contract in question did impose on the complainant Russell what seems now to have been an undue burden in that it obligated him to till the land when it was bought, or to see that it was properly tilled, and to apply the rents and profits to the extinguishment of the mortgage indebtedness, which, when extinguished, would make him the owner of only a one-third interest in the land, while the defendant would become the owner of the remaining two-thirds. In view of this outcome, the bargain as made, seems, at the present time, to have been unfair. We conceive, however, that Russell's desire to obtain at least one-third of the land at the time the bargain was made may have been so strong, and the difficulties which stood in the way of his obtaining the necessary funds to buy the entire tract may have been so great, that he was entirely willing to enter into the contract with the defendant for a joint purchase. He may have perceived, or at least thought that he perceived, some peculiar advantage to himself in allying himself with the defendant in making the purchase on the terms proposed. It may have seemed the only way open to him at the time of becoming the owner of a part of the land, and he may have been willing to assume the burden which the contract imposed to accomplish that end. At all events, in view of the situation of the complainants at the time the agreement was entered into and the motives which may have actuated them at the time, it does not appear to us that the bargain was so unreasonable or unconscionable as to justify the inference that it was never made, and that the deed of April 4, 1896, was not consciously executed by the complainants, but was obtained through some trick or artifice, and is therefore fraudulent. This being a proceeding, so far as the complainants are concerned, to set aside a deed bearing their genuine signatures, solely on the ground that it was procured through some trick or artifice, which deed, on its face, appears to have been formally executed, and to have been duly recorded in the proper office very shortly after it was executed, and to have remained unchallenged by any one for at least four years, and the rule being, in this class of cases, that to warrant a court of equity in setting such a conveyance aside the proof of the alleged fraud must be clear, satisfactory, and convincing to the mind of the chancellor (Atlantic Delaine Co. v. James, 94 U. S. 207, 214, 24 L. Ed. 112; Forrester v. Scoville, 51 Mo. 268; Jackson v. Wood, 88 Mo. 76; Hupsch v. Resch, 45 N. J. Eq. 662, 18 Atl. 372; Pomeroy's Eq. Jur. vol. 2, § 859), we have little hesitation in holding that on the proof contained in this record the

deed of April 4, 1896, ought not to be set aside. In view of what has already been said concerning the character of the evidence, it is obvious that the proof which was relied upon by the complainants to obtain the cancellation of the deed is neither clear, satisfactory, nor convincing. Indeed, it does not seem to preponderate in their favor. It results from this conclusion that the relief prayed for by the complainants in their bill ought not to have been granted, and that the decree of the lower court was erroneous.

We have next to consider and determine what action shall be taken on the defendant's cross-bill, to which reference has already been made in the foregoing statement. By the terms of the decree which was entered in the lower court, the cross-bill was dismissed. This cross-bill appears to have been filed by the defendant mainly with a view of obtaining a receiver of the property while the litigation concerning the ownership thereof was in progress, and incidentally to obtain an accounting of the rents, issues, and products of the land which had been received by the complainant Russell during the years 1896 to 1901, both inclusive. The special master to whom the case was referred esteemed it his duty, as it seems, to take an account as prayed for in the cross-bill, the result being that he reported that the complainant Russell was indebted to the defendant in the sum of about $323.54. The trial court, on entering its decree, observed, however, that no such matter as taking an account between the parties was referred to the master, the reference being only with respect to the issues raised by the original bill and the answer thereto. The order of reference seems to justify this conclusion, since no mention was made therein of the issues presented by the cross-bill. Moreover, the trial before the master seems to have proceeded on the theory that the issue which he was to determine was that as respects the validity of the deed of April 4, 1896, and very little attention was paid by the complainants to the introduction of testimony relating to the accounting. For these reasons the evidence which is contained in the present record is insufficient, in our judgment, to state the account accurately with due regard to the rights of the complainants. It is also probable that crops have been grown on the land since this litigation has been pending, concerning which a further accounting must, in any event, be had.

For these reasons the decree below will be reversed and annulled, and the case will be remanded to the lower court, with directions to order another reference either to the former master or to another master to be selected by the court, for the purpose of restating the account between the parties, if it so happen that they are unable to state the account themselves, and to receive such further testimony on that head as the parties may desire to introduce. Such restatement of the account will proceed upon the theory that the deed of April 4, 1896, is a valid conveyance, and that the defendant, Treat, since the date of that conveyance, has been the owner of an undivided two-thirds interest in the land in controversy, and that the net sum realized from the rents and profits of the land in controversy, including that part thereof which may have been tilled by Russell himself, should have been applied to the payment of the mortgages on

the land and the taxes against the same from and after April 4, 1896. In stating the account the complainant Russell should be allowed credit for all permanent improvements made on the land in the meantime at his own cost and expense. The master reports "that there was no agreement among the parties as to each supposed tenant in common not charging for work in connection with this land until May 4, 1901." In view of this finding, the master will be at liberty to find and state in his report what would be a reasonable compensation for the work and labor performed and the services rendered by the complainant Russell from April 4, 1896, to May 4, 1901, in caring for, managing, and supervising the joint property during that period; but the question whether the complainant should be allowed such compensation as against the defendant will be reserved for future consideration and determination on the coming in of such report.

The decree below is accordingly reversed, and the cause is remanded to the lower court, with directions substantially as indicated in the preceding paragraph.