ATLANTIC DELAINE COMPANY *v.* JAMES.

The power of a court of equity to cancel an executed contract ought not to be exercised, unless the fraud and false representations set up as the ground for relief are clearly proved, and the complainant has been thereby deceived and injured.

APPEAL from the Circuit Court of the United States for the District of Rhode Island.

The facts are stated in the opinion of the court.

*Mr. William M. Evarts* and *Mr. A. Payne* for the appellant.

*Mr. C. H. Hill* for the appellee.

MR. JUSTICE STRONG delivered the opinion of the court.

The bill was originally filed by Charles T. James against the Atlantic Delaine Company, George W. Chapin, and Lyman. B. Frieze ; and, after the death of the complainant, it was revived by his administratrix.   Its object is to obtain a cancellation of a release of James's interest in the capital stock of the company, together with a retransfer of the stock, and an account.   The history of the transaction sought to be annulled is as follows, so far as it is necessary now to refer to it : On the second day of September, 1851, James made a general assignment of all his property, for the benefit of his creditors, to Lyman B. Frieze. Among the properties thus assigned was an interest in the capital stock of the company, for which certificates had never been issued, but which, it is alleged, in equity belonged to. the complainant. - The release sought to be cancelled was made by the assignee.   It was dated March 2, 1853, and acknowledged on the 11th of the same month.   Concurrently with it, the company executed a release to the assignee and to the complainant. of all claims and demands, actions and causes of action whatsoever held by it against the complainant or his assignee, or against the assigned estate.   These mutual releases were intended as a settlement of mutual claims.   The company was a large creditor of General James.   It held his mortgages, and among them one upon his right to the capital stock and property of the corporation ; and it had other claims against him, and claims also against his assignee, as such, growing out of the

assignment. On the other hand, General James had claims against the company, which passed by his deed of assignment to his assignee. An arrangement was then made between the assignee and the company, by which the latter accepted, in full settlement of the claims it held against James and his assignee, a conveyance of all the right, title, and interest which James had at the date of his assignment, and which the assignee then held, in and to the capital stock and property of the corporation; and mutual releases were exchanged. It is this transaction, and the assignee's release, which the complainant seeks to have set aside, alleging that the release and conveyance were obtained by fraud.

It is obvious, at first sight, that most of the allegations of the bill have little, if any, relevancy to that subject. At most, they are matters of inducement, introductory to the one important averment upon which alone the bill can rest. That averment is, in substance, that untrue and incorrect statements of the condition and affairs of the company were exhibited to the complainant's assignee, with intent to deceive him; statements by which he was deceived, and induced to consent to the settlement that was made, and to execute the release of the stock. Unless this allegation has been sustained by proof, the complainant's suit must fail. It is admitted in the appellee's brief that the case turns upon it.

We shall spend no time, therefore, in considering the introductory averments. Most of them are unsustained by the evidence; and, were they all true, they would confessedly be of no importance, if the principal averment is not proved.

The case exhibits but a single statement of the condition and affairs of the corporation, made or furnished to either the complainant or to his assignee, and it is that one which is now charged to have been false and fraudulent. The accuracy and good faith of that alone is assailed. The circumstances that preceded its being furnished to Mr. Frieze, the assignee, were the following: On the 5th of February, 1853, George W. Chapin, the treasurer of the company, and the trustee in the mortgages which James had given to secure the payment of $75,000 borrowed by him, and long past due, by virtue of a power contained in the mortgages, advertised for sale the property described in

them, including General James's interest in the capital stock of the Delaine Company. The times appointed for the sales were the twenty-fifth and twenty-sixth days of the same month; but the sale of the stock was advertised for the twenty-sixth. On the 15th of February, Frieze, the assignee of General James, sent the following note to Chapin: —

"PROVIDENCE, Feb. 15, 1853.

"GEORGE W. CHAPIN, trustee for Hill, Carpenter, & Co., and others, and treasurer of the Atlantic Delaine Company: .

"DEAR SIR, — I feel it my duty to demand of you a statement of the condition, standing, and accounts of the Atlantic Delaine Company, so that I may be able to represent the delaine stock, &c., which you have advertised, as trustee, to be sold on the 25th and 26th instant, in its true light and value, and make it sell for what it is worth.            Very truly yours,

"L. B. FRIEZE,
"Assignee of Charles T. James."

The note upon its face explained for what the statement was wanted. It was that the assignee might know, so far as the account would show, the value of the stock, and that he might guide his action by that knowledge. Before, however, any statement was made out and furnished, in answer to this demand, the sale of the stock was enjoined; but, on the 26th of the month, Chapin made out and sent to Mr. Frieze the following: —

*Statement of the Atlantic Delaine Company, Jan. 1, 1853.*

| | |
|---|---:|
| Bills payable | $410,615.39 |
| Due agents for advances on goods | 90,026.19 |
| Due various persons on account | 51,404.44 |
| Capital stock | 237,495.53 |
| | $789,541.55 |

*Credit.*

| | |
|---|---:|
| Cash and bills receivable, on hand | $13,584.92 |
| Cost of real estate, cassimere department, and amount paid Charles T. James's contract account | 310,006.04 |
| Due from Lyman B. Frieze, assignee | 53,314.77 |
| Due from sundry persons | 2,061.38 |
| Wool, cotton, and supplies at mill | 190,692.17 |
| Delaines, cassimeres, on hand | 149,516.74 |
| Balance | 70,365.53 |
| | $789,541.55 |

"I would state that our directors estimate that $50,000 or more of the above balance accrued from the non-fulfilment of the contract with Charles T. James, which they shall prosecute against him or his assignee.

"The above is a true copy from the books.

"(Signed)    GEORGE W. CHAPIN, *Treasurer.*

"PROVIDENCE, Feb. 26, 1853."

The Circuit Court was of opinion that this statement was false and fraudulent, and that it was furnished with the intent to deceive and defraud, by promoting a settlement prejudicial to General James, and more favorable to the corporation than truth and justice would admit. With this opinion we cannot concur. A careful and thorough examination of all the evidence submitted has failed to convince us that there was any substantial error in the statement, or that it did not truly exhibit the condition, standing, and accounts of the company when it was given. There are not many particulars in which it is now alleged the exhibit was untrue. We shall notice all that are alleged.

1. It is said, on behalf of the complainant, that the item on the debit side, "$410,615.39, bills payable," includes promissory notes amounting to $76,000, given by the company to their agents in exchange for accepted drafts drawn upon the agents, on account of manufactured goods consigned to them. Admitting such to be the fact, we do not perceive that it shows any inaccuracy in the items. It is abundantly proved, and it is beyond all doubt true, that the sum of the company's notes outstanding at the time was exactly what it was stated to be, and the company was liable for them all. The notes for $76,000, equally with the others, were to be paid, either in money or out of the proceeds of the goods in the agents' hands, if, from the latter, the value of the goods would be correspondingly decreased. But it is not denied that the statement credits the company with the full value of the goods in the agents' hands, without making any deduction for the drafts drawn against them. Besides, the evidence is that the drafts, in exchange for which the notes for $76,000 were given, were not in fact drawn against the consignments. They were accommodation acceptances. It is impossible, therefore, to conclude that this item on the debit side of the statement, to which the complainant now objects, was not

strictly accurate.    No other inaccuracies in the debit side are alleged.

2. The next allegation of falsehood in the statement refers to the second item on the credit side, which is " cost of real estate, cassimere department, and amount paid Charles T. James's contract account, $310,006.40."    This sum was made up of three items of expenditure, the first two not belonging to the contract with James for building the mill; namely, $13,140.60 paid for the real estate, $40,250.33, the cost of the cassimere department, and $256,615.11, the sum paid and charged to General James on his contract for building the mill.    These items are admitted to have been correct.    They amount to the sum set out in the statement.    But it is argued the mill had cost more.    It is said there was still due to General James on his contract the sum of $29,000, and he had a claim for extra work, it is said, amounting to $79,000 more. These two sums, it is argued, should have been added to the $310,006.40, to show the true value of the real estate, cassimere department, and mill.    Yet it is obvious, had that been done, it would have been necessary to carry the two sums to the other side of the account, as debts due from the company, and charge them there.    Thus the apparent indebtedness of the corporation would have been increased equally with the apparent increase of its assets, and the balance of the account would have remained as stated.    But the objection made to the item misstates it or misapprehends it.    Mr. Chapin, the treasurer, did not undertake to give the cost of the mill or its value.    He had no better means for estimating the value of the mill or its cost than General James himself had, or than his assignee had. James had undertaken to build it, and to furnish it with all the machinery needed.    He knew what the contract price for building it was, and he knew what extra work had been done. So did his assignee, who by the assignment had been directed to go on and complete what the assignor had undertaken to do. And when Mr. Frieze demanded a statement, it was a statement of the condition, standing, and accounts of the company. What was given in answer to the demand was not an estimate of the value of the mill (which was not demanded), but a true statement of the cost of the real estate and of the cassimere

department, together with the amount paid General James on his contract for completing the mill. The statement undertook to give nothing more, and there is no just reason for saying that in this particular the statement was in the least degree either fraudulent, imperfect, or untrue.

3. It is next contended that the fifth and sixth items on the credit side were incorrect, and fraudulently so. Those items are "wool, cotton, and supplies at mill, $190,692.17," and " delaines, cassimeres on hand, $149,516.74." But we do not find any considerable error in these sums, and certainly there is no evidence that the very small error we do find was intentional. In addition to the number of cases of delaines which the company had in the hands of Day, Owen, & Co. there appears to have been a mistake of eleven cases, of the value of $1,120. This is easily accounted for without imputing fraud. It was simply a clerical omission of one column in adding, a very common error in transcribing and footing up accounts. And the error is too small and too unimportant to justify any inference that it was not accidental. Apart from this, nothing has been adduced to show that the quantity and value of the wool, cotton, and supplies at the mill, together with the delaines and cassimeres on hand, including those in the hands of agents of the company, were not truly represented in the statement furnished to Frieze. No evidence whatever has been given to prove that there was any greater quantity; and that the value was not under-estimated plainly appears in the fact that the goods were very shortly afterwards sold, and brought less at the sales by several thousand dollars than the sum at which they have been estimated. Moreover, the correctness of the items assailed is vindicated by their correspondence with the inventory of the company, taken Dec. 31, 1852. It is said that the items do not correspond with the exhibition made by the trial balance of Dec. 31, and this is true; but the fact is unimportant, for the trial balance exhibited the cost, while the statement, corresponding with the inventory, exhibited what was supposed to be the market value.

These are all the particulars in which it has been contended the statement made to Frieze, the complainant's assignee, by the treasurer of the corporation, is false or fraudulent. Unsup-

ported as the attack upon the statement is, in our judgment, by any considerable proof, its substantial correctness is vindicated by convincing evidence.   Not only does the testimony of Mr. Chapin, the treasurer of the company, prove it, but so also does that of Mr. Blodget, an experienced book-keeper, and that of Mr. Balch, an expert selected for the complainant to examine the books.   Each of these witnesses affirms to the accuracy of the statement.   And the complainant has produced no evidence to show that the company had more property, or property of greater value, or that its liabilities were less than represented to him.

It is true, as has been urged upon our attention, that the statement furnished concluded with the following : " The above is a true copy from the books," and this was not strictly correct.   It was not a copy.   There was in fact no such statement on the books.   But most of the items were there, and the books were sufficient to enable the treasurer to make it up.   If those items were correctly extracted, it was of no importance whether the statement was literally a copy or not.   All that was probably meant was, that the particulars of the statement were taken from the books.   Yet, if not, if the representation that the statement was a true copy from the books must be regarded as intentionally untrue, it cannot be said to have been hurtful to the complainant or to his assignee.   What was asked for and what was needed was a statement of the condition and affairs of the company, to enable Mr. Frieze to estimate the value of the stock, and to take measures to have it bring its value at the impending sale.   If the statement he got in response to his demand was a true representation of the condition of the company (which we think it substantially was), he cannot be said to have been deceived or defrauded by it ; and his testimony in this case is that he does not think he was deceived.   He submitted the statement to a judicious friend ; and, acting on the advice of that friend, as well as on his own judgment, he agreed to the settlement that was made, — a settlement in which, as it seems to us now, he obtained all that the stock was then worth.   It was not until nearly six years afterwards — no complaint of unfairness having been made to the defendants in the mean time — that this bill was filed to undo what had been done, and to pro-

cure a cancellation of the mutual releases and of the transfer of the stock to the corporation. Cancelling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them. We think no such case is now presented. The fundamental averment of fraud is not sufficiently sustained by proof. The bill must, therefore, be dismissed.

*Decree reversed, and cause remitted with instructions to dismiss the bill.*

MR. JUSTICE CLIFFORD dissented.