ELLA M. HUTCHINSON, Plaintiff in Error, *vs.* JAMES F. BAMBAS, Defendant in Error.

*Opinion filed April 19, 1911.*

1. APPEALS AND ERRORS—*fact that record contains all the evidence need not appear from chancellor's certificate.* It is essential that the record in a chancery case shall show that it contains all the evidence heard but it is not essential that it should so appear from the certificate of the chancellor, and if the fact is manifested in any other way it is all that is required.

2. EVIDENCE—*when objections for want of proof of loss of letters are waived.* Where the plaintiff in a chancery proceeding testifies by deposition, and after stating, in a general way, that she had none of the defendant's letters and that she had lost some of them proceeds to state the information received from the defendant by means of the letters, without any objection being made to the questions at the time or before the hearing, all objections which might have been obviated by further proof as to the loss of the letters are waived on the hearing.

3. LACHES—*when defense of laches must be set up by answer.* Where a bill in chancery does not attempt to account for any delay that may have occurred in seeking relief, the defendant, if he desires to avail himself of the defense of *laches,* must set it up in his answer, so as to give the complainant an opportunity to amend the bill and give the reasons for the delay.

4. EQUITY—*when a transaction involving exchange of lots for bonds should be set aside.* An exchange of lots for bonds, made between the owner of such lots and her former agent, is subject to being set aside in equity upon the discovery that the bonds are worthless, where the evidence shows either that the agent was honestly mistaken as to the identity of the bonds and led the lot owner, without negligence on her part, into the same mistake, so that it was mutual, or that the agent was guilty of intentional fraud in his representations concerning such bonds.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding.

FRANK O. CAMPE, and HAYDEN N. BELL, for plaintiff in error.

H. P. SINDEN, (TOLMAN, REDFIELD & SEXTON, of counsel,) for defendant in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The plaintiff in error, Ella M. Hutchinson, filed her bill in the superior court of Cook county against the defendant in error, James F. Bambas, praying the court to set aside a conveyance by her to him of thirty-six lots in the city of Chicago, which she charged was obtained by fraud and undue influence while he sustained a fiduciary relation to her. She offered to return the consideration, and prayed for an adjustment of the accounts between them arising out of taxes and other charges against the lots paid by him and a mortgage on the lots which he had executed. She had sold one of the lots before the conveyance and it had been nearly paid for. That lot was conveyed subject to the contract of sale and was afterward conveyed to the purchaser, leaving the thirty-five remaining lots as the subject of the controversy. The court dismissed the bill for want of equity, and the writ of error in this case was sued out to bring the record to this court for review.

Objection is made to a consideration of the merits of the controversy because the certificate of evidence does not show that it contains all the evidence offered and received in the hearing of the case. There were depositions, which were a part of the record without any certificate, and it appears from the statements of the solicitors immediately preceding the certificate of the chancellor that the depositions, with the evidence certified to, were all the evidence heard by the court. It is essential that the record shall show that it contains all the evidence heard, but it is not essential that it should appear from the certificate of the chancellor. If the fact is made manifest in any other way it is all that is required, (*Stickney* v. *Cassell,* 1 Gilm. 418; *Reed* v. *Bradley,* 17 Ill. 321;) and the fact affirmatively appears in this record.

The complainant testified by deposition, and upon the hearing objections were made to her testimony concerning

what the defendant wrote to her. She stated in a general way that she had none of his letters and had lost some of them, and then stated the information received from the defendant by means of the letters. No objection was made to the questions at the time nor before the hearing, and inasmuch as any objection could have been obviated by further proof concerning the loss of the letters, all objections for want of such proof were waived. *Toledo, Wabash and Western Railway Co.* v. *Baddeley,* 54 Ill. 19; *Illinois Central Railroad Co.* v. *Foulks,* 191 id. 57.

It is also contended that the complainant was guilty of *laches* which ought to bar any relief. The bill did not attempt to account for any delay that had occurred, and in such a case, if a defendant desires to avail himself of *laches* on the part of the complainant, he must set it up in his answer, so as to give the complainant an opportunity to amend the bill and give the reasons for the delay. (*School Trustees* v. *Wright,* 12 Ill. 432; *Zeigler* v. *Hughes,* 55 id. 288; *Hall* v. *Fullerton,* 69 id. 448.) The defense of *laches* was not set up in the answer, and if it had been, there was no delay which would bar the remedy. The bill was filed within a few months after the complainant had full information of the facts.

The evidence established the following facts: The complainant, Ella M. Hutchinson, a widow, sixty-seven years old, living at Gloversville, New York, was the owner of the lots described in the bill, and defendant was a real estate agent in Chicago. About the month of January, 1906, the defendant became the agent of the complainant for the care and management of the lots, the payment of taxes and special assessments and to make sales. The complainant was anxious to sell the lots and wrote to the defendant frequently, asking him to endeavor to make sales and complaining of the burdens of taxes and special assessments. In the early part of 1908 the defendant had a proposition to trade some land he had in Missouri for three bonds of a

New Jersey corporation for $1000 each, issued August 1, 1905, due in twenty years and drawing six per cent interest, payable annually. He procured a friend who was book-keeper in the Corn Exchange Bank in Chicago to ascertain about the bonds. The book-keeper obtained a report, dated March 2, 1908, concerning the New Jersey Iron and Steel Company and the bonds issued by it, and gave it to the defendant. The bonds which the defendant was to get were issued by the New Jersey Iron and Steel Corporation, a different corporation from the one reported upon. The report was favorable, stating that the corporation was doing a good amount of business; that the interest had always been promptly paid; that the corporation was financed and backed by the American Finance Company of New York, but that the party making the report had no knowledge of the present market value of the bonds. On March 10, 1908, the defendant traded his land for the bonds, through a broker, with a man named Lawson, who he was told lived at the Morrison Hotel and whom he had never seen and never saw afterwards. The coupons for the interest due on August 1, 1908, had been removed. The bonds were not bonds of the New Jersey Iron and Steel Company mentioned in the report, but were bonds of the New Jersey Iron and Steel Corporation and were worthless. They were payable, principal and interest, at the Ætna Banking and Trust Company of Washington, D. C., which had been closed up in 1906 by the authorities as an insolvent and fraudulent concern. On the back of the bonds was printed a guaranty, with the printed signature of the Ætna Banking and Trust Company, not signed by any officer of that company. An application had been made to the company to guarantee the bonds, but it had not been done. The bank was a swindling institution, and while it received some deposits, its principal business was to guarantee stocks and bonds of corporations and to act as trustee for the bondholders in certifying and registering stocks

of corporations, mainly mining companies and other corporations without assets. Some of the corporations existed in form, only, and were organized simply for the purpose of issuing bonds and stocks for sale. The Ætna Banking and Trust Company was accustomed to give certificates of deposit, without money or consideration, to parties organizing fraudulent corporations, to enable them to show assets on hand in compliance with the law, and was engaged, with the officers of the mythical corporations, in thieving under the forms of business. The receiver of the bank was unable to find the officers of the New Jersey Iron and Steel Corporation, and concluded that it was one of the fraudulent concerns having no existence which had been in correspondence with the bank to have its bonds guaranteed. The defendant said that he did not examine the bonds before he took them; that he examined them in a general way before he closed the deal, but not enough to see where they were payable or to observe that the interest was payable on the first day of August, although the coupons for the interest due the following August had been taken off. He said he did not examine them enough to see that they were the same bonds that the book-keeper had looked up and did not recall whether he noticed the name of the corporation. At any rate, soon after getting the bonds the defendant wrote to the complainant offering her $3000 in cash and the three bonds for her lots. The negotiations were all by letter and there was much correspondence on the subject. The defendant testified that he made no representation to the complainant concerning the bonds except what was contained in the report he had from the book-keeper of the Corn Exchange Bank, and that he wrote her what that bank said about them, which, in fact, was a report about a different corporation. On March 31, 1908, she wrote to him that she had her banker write to parties in New York City about the bonds and could not find them quoted, and on April 6 she wrote again that she was still

making inquiries concerning the bonds, and had a letter from a reliable house that the company was owned by the American Finance and Securities Company. She continued her investigations, but they were in relation to the bonds of the New Jersey Iron and Steel Company and not of the worthless New Jersey Iron and Steel Corporation. She did not reach any conclusion, and on June 4, 1908, she wrote the defendant that she thought best to place the lots in the hands of an agent nearer them and had made arrangements to that effect, and that she was sailing for an extended trip abroad. She left to him the collection of the balance due on the lot which had been sold, and he afterward wrote to her about special assessments and sent her notices. She returned from her extended trip the middle of September and the correspondence was then renewed. She wrote him on October 13, 1908, that she would try to find out about the bonds and asked him to send her one to look over. He did not send one but wrote her, mentioning the corporation as the New Jersey Iron and Steel Corporation. She evidently did not notice the difference in the name, and wrote him that she had learned a good deal about the New Jersey Iron and Steel Company, which was owned by the American Finance and Securities Company, and had learned that they kept up the interest on their bonds and preferred stock; that there was then no market for the bonds on the street and that the outlook for the business of the company was rather poor, but she offered to take the bonds and $3500 in cash. The defendant accepted the proposition and a contract was made and he paid $100 on the purchase price. He then executed a trust deed on the lots on December 12, 1908, as security for a loan of $3800, giving as further security forty shares of homestead and loan association stock on which some payments had been made. Afterwards, on December 17, 1908, the complainant conveyed the lots to the defendant and he paid the balance of $3400 and delivered the bonds. The com-

plainant kept the bonds, and when the interest became due, on August 1, 1909, she sent the coupons to the Ætna Bank and Trust Company of Washington, and learned that there was no such company there and that the bonds were worthless. She seemed unwilling to believe that the defendant had intentionally swindled her and her letters still manifested confidence in his good intentions. She wrote that she had thought she could get fifty cents on the dollar from the bonds but had no authority from him for thinking so, and wondered what the Corn Exchange Bank could say, as the bank was quoted by him as saying that the bonds were all right. She soon came to think that she had been defrauded and filed the bill on March 19, 1910.

Experts testified for each party as to the value of the lots, and with the customary elasticity of judgment fixed the value in accordance with the views of the party calling them. Those testifying for the complainant were of the opinion that the thirty-five lots in controversy were worth from $9000 to $9400, while the experts for the defendant valued the thirty-five lots at $3500, and did not consider them worth any more than the cash payment, without taking any account of the bonds. When it came to facts, however, one of the lots had been sold for $350 and three sold together for $800 within two years before this transaction. The lots were assessed at $1824 on a one-fifth valuation, which would make the full value $9120, and as the assessor's valuation was not made for the purpose of a lawsuit nor in the interest of anyone, we conclude that the lots were worth more than the cash and the bonds if the bonds had been worth par. The defendant mortgaged the lots for $3800, with the additional security of some homestead and loan stock worth not more than $400, if that much, which indicates that the lots were worth more than the defendant claimed at the hearing.

As against the conclusion of the chancellor, it is argued that there was a confidential or fiduciary relation between

the complainant and the defendant, which rendered the sale and transfer presumptively fraudulent and threw the burden upon the defendant to show, by clear and convincing proof, the utmost good faith on his part. On the other hand, it is contended that the relation had terminated by the letter of June 4, 1908, and that the complainant made an independent investigation and did not rely upon any trust or confidence that she had in the defendant. The relation between the parties as principal and agent had not entirely ceased, but we do not consider it worth while to go into the question of a fiduciary relation, for the reason that there was either a mutual mistake or fraud on the part of the defendant which would render the transaction voidable. The defendant was cheated or made a serious mistake in acquiring the bonds, since his investigation through the book-keeper of the Corn Exchange Bank related to a different corporation. At the hearing he did not recollect, or at least did not make any disclosure, as to whether he found out the fact of his error or of the fraud while he held the bonds, but it is remarkable if he did not ascertain in some way that they were worthless. He was a business man who had been actively engaged in the real estate business in Chicago for about fourteen years, and it seems strange if he did not even know what corporation issued the bonds. He did not make any representation to the complainant as to value except to write her that the Corn Exchange Bank had made a certain report, which misled her to investigate the bonds of a different corporation. She made the investigation, but was led by the conduct of the defendant, whether innocent or· wrongful, to investigate the wrong corporation. Either the defendant still supposed, at the time of the transaction with the complainant, that the bonds were bonds of the corporation reported upon by the book-keeper, and the complainant was led into the same mistake through him, so that the mistake was mutual, or else he was guilty of a fraud in leading her to make the

investigation of the other corporation and deceiving her as to what bonds she was to get. If he prefers the inference that he was ignorant and that there was a mutual mistake rather than that he was attempting to cheat the complainant there is no objection to that conclusion, as it makes no difference in the result. A party will not be given relief against a mistake induced by his own negligence and he must use due diligence to investigate alleged false statements, (*Jones* v. *Foster*, 175 Ill. 459,) but when all the facts are considered it cannot be said that the complainant was guilty of negligence. It is not surprising that a widow of her age, not engaged in business, did not notice the difference in the names of the corporations,—at least if defendant did not,—or discover the mistake until the interest became due, and it was not unreasonable that she should rely upon his statement of a report by the Corn Exchange Bank. In any view of the rights or relations of the parties the transaction was subject to be set aside at the election of the complainant, and the court erred in not setting it aside.

The decree is reversed and the cause is remanded to the superior court, with directions to set aside the conveyance as to all lots in controversy the title of which remained in the defendant when the bill was filed, and to take an account and adjust the equities between the parties as to taxes, special assessments and charges against the land paid by the defendant, the cash received by the complainant and the encumbrance upon the land created by the defendant.

*Reversed and remanded, with directions.*