EDWARD F. DIEDRICH *et al.,* Plaintiffs-Appellants, *v.* NORTHERN ILLINOIS PUBLISHING COMPANY *et al.,* Defendants-Appellees.

Second District (1st Division)    No. 74-441

Opinion filed June 3, 1976.—Rehearing denied August 5, 1976.

Edward F. Diedrich, *pro se,* and J. Powers McGuire, both of De Kalb, for appellants.

Tyler, Peskind & Solomon, of Aurora, and Gene Nottolini and Robert A. Chapski, both of Elgin, for appellees.

Mr. JUSTICE HALLETT delivered the opinion of the court:

The plaintiffs in this case filed an action seeking to rescind a contract for the sale of a house, over 2½ years after they had taken possession of it, on the ground that the seller falsely stated that the structure was capable of housing 20 student roomers whereas in fact part of the house was serviced by a septic tank designed to service a single family and that the defendant seller either knew or should have known that his representation was false or, in the alternative, that the contract should be rescinded because of the mutual mistake of the parties. The plaintiffs also sued both the defendant seller and the defendant newspaper for their alleged libel in publishing an ad stating the plaintiffs were in default. After hearing the evidence, the

court directed a verdict for the seller on his counterclaim for specific performance. The jury found for the defendants and against the plaintiffs on the libel claim. The plaintiffs have appealed, contending (1) that the evidence as to mutual mistake was sufficient to go to the jury; (2) that the direction of a verdict on the contract claim confused the jury and in effect directed them to find that the statement was truthful; and (3) that the verdict form was confusing. We find no error and affirm.

The relevant facts, for the most part, were uncontradicted. The defendant seller inherited the house in question when his father died in 1967. It is a single-family house built in 1900 or earlier and is located in the city of De Kalb, Illinois. Because the seller lived in Elgin, and had done so for 15 years, he put it up for sale at the appraised price of $65,000. The property was listed with the Royce Thompson Agency, for whom plaintiff Skoglund works. Ms. Skoglund has been a licensed real estate salesperson for the past 11 years. She showed the house on several occasions. When she showed the house to other interested purchasers, she never mentioned the condition of the plumbing. Ms. Skoglund made no attempt to find out if the property was connected to the city sewer. She assumed it was since anything in the city limits is usually on the sewer.

There were no offers to purchase the house until August, 1969, when plaintiff Skoglund and plaintiff Diedrich decided to form a partnership and purchase the house to convert it to a student rooming house. It had been licensed for such use as the seller's mother had had six roomers living there. Mr. Diedrich is an experienced attorney who has practiced for over 13 years. He has also engaged in some other real estate transactions for investment purposes. They offered to purchase the property for $45,000.

At no time before purchasing the property did plaintiff Diedrich have any conversations with the seller or inspect the house. Ms. Skoglund had of course seen the premises but not in the defendant seller's company. The plaintiffs were aware that the house was over 70 years old and would need extensive repairs and modification. They could see that it still had the original plumbing including a bathtub on legs. Despite the allegations in the complaint, the seller's testimony that he was never told that the property was to be used as a student rooming house was in no way contradicted by the plaintiffs. Likewise they agreed that he made no representations as to the plumbing.

Mr. Diedrich, by mail, offered in August, to purchase the house "as the property is this day, ordinary wear and tear accepted." The contract of purchase likewise was drawn up by Mr. Diedrich. The plaintiffs were to purchase the house and pay for it over a 5-year period. Upon final payment by the plaintiffs, the seller was to convey the title to the property. The parties all agreed that the property was purchased "as is."

The plaintiffs thereupon took possession of the house and made

extensive changes in it. The seller became aware of these changes when he drove by and was shown through it. He made no objection to the changes. The plaintiffs operated the house as a rooming house and collected rents from 1969-1973.

The testimony seems to indicate that there had been no trouble with the plumbing in the 8 years before the house was sold. Nor was there any trouble for 2 years after it was sold. But in October of 1971, plumbing problems developed, in the form of backup of sewage in the basement area and a plumber was called. At that time 17 students were living in the house. They had more problems in February of 1972 and a plumber was called again. The number of roomers decreased to six and there have been no subsequent plumbing problems.

It has now been determined that part of the house is served by a septic system for the disposal of sewage. That septic system is not connected to the De Kalb municipal sewer system. It is not known if there is a private sewer line. This septic tank serviced the floor drains in the basement, showers, and two sinks. The defendant seller always believed (and still does) that while there the plumbing system was split, both ran into city sewers. While the septic tank was not actually discovered until during the course of the trial, the defendants were informed by the plumber in December, 1971, or January, 1972, that there was a septic tank. The plaintiffs offered no evidence as to the cost of repairing or correcting the sewer line.

The plaintiffs were consistently late in making the payments on the house and several checks bounced. However, the seller did not protest until November, 1971. Ms. Skoglund asked him to be patient. She did not mention any plumbing difficulties. The October and November payments were finally made at the end of November. In January, 1972, the plaintiffs were again behind on their payments. When the seller complained, Mr. Diedrich told him they were looking for fresh monies and were having problems and had a plumbing problem. Mr. Diedrich did not say he wished to rescind the contract nor did Ms. Skoglund. Likewise, in Mr. Diedrich's letter to the seller's attorney, written January 24, 1972, he states that they were having trouble filling the house because of Ms. Skoglund's illness and the plumbing problems arising from the septic tank and that they would be meeting their responsibilities in the very near future and asked the seller's cooperation. At no time did either plaintiff inform the seller or his attorney they wished to rescind the contract.

The plaintiffs did not pay any installments after November, 1971 nor did they pay the real estate taxes as they were obligated to do. The seller, overwhelmed at the litigation he might have to suffer through, published the following ad in the *Daily Chronicle*:

"NOTICE
TO THE STUDENT ROOMERS AT
235 NORTH FIRST STREET

DUE TO THE DEFAULT OF PAYMENTS BY ATTORNEY
EDWARD DIEDRICH AND SUE SKOGLUND FOR THE PAST
FOUR MONTHS, I MUST ASK YOU TO FIND OTHER
QUARTERS BY THE END OF THE MONTH.

JOHN COLE"

Before publishing this he had sent a copy of it to the plaintiffs. He had also discussed this with his lawyers who had advised him that it was not libel because it was the truth. The same advice was given to the newspaper when they checked with the seller's attorneys before publishing the ad. The seller was aware that there were some roomers living in the house. In fact he published the notice so that they would leave and he could make some money off of the property since he had not received any money for several months. He also hoped that possibly the plaintiffs would finally be shamed into paying the money they owed.

While there are no longer any students living in the house, this is due to the fact it is in bad need of repair because of the way the students treated it. It was "a kind of hippy group" which lived in it in the fall of 1972.

After hearing the evidence, the trial court found that the seller had in no way deceived the plaintiffs and that as a matter of law the contract case should not go to the jury. The court then directed the jury to return a verdict against the plaintiffs in favor of Cole for $47,000.

The court submitted the libel claim to the jury, with instructions on the issue submitted by the parties. The jury returned a verdict reading:

"We, the jury, find for the defendants, Northern Illinois Publishing Company and John Cole, and against the plaintiffs, Edward Diedrich and Sue Skoglund."

This verdict form had been submitted by the plaintiffs. The jury also answered yes to a special interrogatory which stated:

"as to the alleged libel of plaintiffs by defendants was the publication true, published with good motives and for justifiable ends."

At no time have the plaintiffs claimed that this finding was against the manifest weight of the evidence.

Obviously, the court was correct in ruling that the plaintiffs had not been guilty of either misrepresentation or concealment. Furthermore, the plaintiffs have waived this contention by not raising it on appeal.

■■ The court was also correct in ruling that the contract should not be rescinded for mistake. If by reason of a mistake of fact by one of the parties to a contract not due to his negligence, the contract is different with respect to the subject matter or terms from what was intended, equity will rescind the contract where the parties can be placed in *status quo*. (*Steinmeyer v. Schroeppel* (1907), 226 Ill. 9, 80 N.E. 564.) But as the plaintiffs concede, before the contract can be rescinded they must prove that the parties were both mistaken as to a material matter; that this matter is of such grave consequence that enforcement of the contract would be unconscionable; that the plaintiffs' mistake occurred despite the exercise of reasonable care; and that the other party can be placed in *status quo*. Since the plaintiffs failed to make a prima facie case as to any of these factors, the court properly refused to submit the claim to the jury.

In order to justify rescission, the mistake must relate to an essential matter. (13 Williston on Contracts §1543 (3d ed. Jaeger 1970).) As Williston states at section 1544, at pages 94-96:

> "It is often said that a mistake, in order to justify rescission, must relate to the intrinsic nature of the bargain, and, in distinction from this, a mistake in regard to a collateral matter or in regard to some matter which formed merely the inducement to a contract is said to be without effect.
>
> It seems too broad to say, as many courts have done, that the contract is voidable whenever the matter to which the mutual mistake relates is so fundamental that the parties would not have entered into the transaction had they known the true situation.
>
> It seems a better mode of statement to say that a mistake vitally affecting a fact or facts on the basis of which the parties contracted renders the contract voidable by an injured party. That is, where the parties assumed a certain state of facts to exist, and contracted on the faith of that assumption, they should be relieved from their bargain if the assumption is erroneous * * *."

It is obvious that while the seller was, in fact, ignorant of the existence of the septic tank, its existence was a matter of indifference to him. Nor did he have any idea it might be important to the plaintiffs. The house was sold as a *residence* and the plumbing had served the residence quite adequately in the past. Furthermore, since the plaintiff Skoglund never discussed the plumbing when showing the house, and she rather than the defendant was the expert in matters of realty, it would appear that she too did not at the time consider the plumbing to be important.

Furthermore, the existence of the septic tank relates only to the value of the house and the profit the plaintiffs had hoped to obtain from using it. But a contract fairly entered into for an adequate consideration cannot be

avoided or disregarded by one of the parties to it because he discovers that the contract is less profitable to him than he anticipated when he entered into it. *(Kahn v. Continental Casualty Co.* (1945), 391 Ill. 445, 63 N.E.2d 468.) As stated by Williston, section 1569, page 453:

> "Undoubtedly, it is true that in contracts to buy or sell with no warranty goods specified or particularly described, the fact that the goods are better or worse than supposed or possess different qualities not affecting identity will ordinarily be immaterial, and the same principle is applicable to other contracts than those of purchase and sale, where the nature or quality of some object is involved."

The plaintiffs have cited no cases involving similar factual situations and our own research has revealed none. But in an analogous situation, the court in *A & M Land Development Co. v. Miller* (1959), 354 Mich. 681, 94 N.W.2d 197, refused to grant rescission of a land contract to a subdivider on the theory that there was a mutual mistake as to the percolation capability of the soil on several of the lots conveyed although the value of the land to him was diminished because he had been unsuccessful, at least on a tentative basis, in acquiring septic tank permits because of the poor absorptive quality of the soil. We agree with the court's reasoning at 354 Mich. 681, 693-94 N.W.2d 197, 202-03, that:

> "It is quite possible that for various reasons plaintiff's investment did not turn out as well as its officers had hoped and expected. If such is the situation equitable relief by way of rescission may not be granted unless plaintiff was defrauded, or was induced to make the contract in question by misrepresentations, on the part of defendant or his agent, as to material facts. *Schultz v. McCarty*, 253 Mich. 445. In *Atlantic Delaine Co. v. James*, 94 U.S. 207, 214 (24 L. Ed. 112), it was declared that:
>
> 'Cancelling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them.'
>
> Under the facts in the case at bar plaintiff is not entitled to the relief sought by it on the ground of failure of consideration. The same situation obtains with reference to the claim that there was a mistake, either mutual or on the part of plaintiff, of such character as to justify a court of equity in granting partial rescission and damages. There was here no mistake as to the form or substance of the contract between the parties, or the description of the property constituting the subject matter. The situation involved is not at all

analogous to that presented in *Scott v. Grow*, 301 Mich. 226, (141 A.L.R. 819). There the plaintiff sought relief by way of reformation of a deed on the ground that the instrument of conveyance had not been drawn in accordance with the intention and agreement of the parties. It was held that the bill of complaint stated a case for the granting of equitable relief by way of reformation. In the case at bar plaintiff received the property for which it contracted. The fact that it may be of less value than the purchaser expected at the time of the transaction is not a sufficient basis for the granting of equitable relief, neither fraud nor reliance on misrepresentation of material facts having been established."

In addition, since the plaintiffs failed to introduce any evidence as to the cost of remedying the situation, it is impossible to determine whether the mistake was material even to the value of the property. The plaintiffs cannot purchase property for speculation, after having been involved in similar transactions in the past, knowing that they must incur large expenditures to rebuild the property for a new use, and then when some minor unanticipated expense appears, come crying to the court that they want out of the transaction, particularly when it appears that their losses were caused at least in part by Ms. Skoglund's illness, and a falling out of the partners as well as the vandalism of the students.

It is also difficult for this court to believe that the plaintiffs were actually mistaken. They, or at least Ms. Skoglund, were familiar with the house. They were aware that it was built around the turn of the century and that it did not have modern plumbing. De Kalb is and was a small farming community and while it now has a city sanitary system, there was no reason to assume that such an old house, which had not been improved, would be connected to it.

■■ At least, if the plaintiffs did in fact realize that the sewer connections were important and act upon the assumption that the plumbing was connected to the city system they were, considering the facts and their own expertise, negligent in doing so. The court will not allow rescission where the mistake resulted from want of the care and diligence exercised by persons of reasonable prudence under the same circumstances. (*Steinmeyer v. Schroeppel* (1907), 226 Ill. 9, 80 N.E. 564; *Hutchinson v. Bambas* (1911), 249 Ill. 624, 94 N.E. 987.) If persons familiar with real estate investment wish to invest in property to be converted to a quite different use than that for which it is sold, one would expect them to investigate to determine if it is in fact convertible. But the plaintiffs made in fact no inquiry at all, even of the person who had serviced the system on previous occasions and who was aware of the existence of the septic system; nor did they attempt to do so.

In addition, the contract of sale was made in September, 1969. The

plaintiffs did not make any attempt to rescind when they were first informed of the existence of the septic tank in December, 1971 or January, 1972. A prompt election to rescind is essential (*Eisenberg v. Goldstein* (1963), 29 Ill. 2d 617, 195 N.E.2d 184, *cert. denied*, 377 U.S. 964, 12 L. Ed. 2d 735, 84 S. Ct. 1645); 13 Am. Jur. 2d *Cancellation of Instruments* §44 (1964).

■■ Furthermore, normally a party can only rescind if the other party can be restored to the *status quo*, at least unless the strongest equity imperatively demands it. (*Corbett v. Devon Bank* (1973), 12 Ill. App. 3d 559, 299 N.E.2d 521; *Santucci Construction Co.v. County of Cook* (1974), 21 Ill. App. 3d 527, 315 N.E.2d 565; 13 Am. Jur. 2d *Cancellation of Instruments* §39 (1964).) The plaintiffs never offered to put the defendant in *status quo* nor could they. The plaintiffs have completely altered the house so that it is no longer suitable as a single-family residence. Furthermore, the evidence discloses that the house has been so badly vandalized by the students that they no longer wish to live there. The house is several years older than when the plaintiffs purchased it and housing markets change. Furthermore, the plaintiffs have enjoyed the use of the house for 5 years and during those same years the defendant, through no fault of his own, was deprived of the use of the house and any profits from it.

■■ Considering the fact that the house was sold as a single-family residence "as is" and that the alleged mistake only went to the question of value of the bargain made, it is obvious that it would not be unconscionable to enforce the contract the parties made. To the contrary it would be unconscionable to allow the plaintiffs to avoid their obligations. The seller was a layman not possessing any particular expertise, he had not lived in the house for 15 years and was not particularly familiar with it. On the other hand, both of the plaintiffs were quite familiar with the real estate investments and Ms. Skoglund had been hired, as an experienced salesperson, to sell the house. The plaintiffs initiated the transaction, and drew up the offer to sell and the contract which the defendant simply signed. They had no personal contact with the defendant at that time. They made no effort to determine if the plumbing was suitable. They made no representations to him as to their special needs; to the contrary, they were familiar with the condition of the house and took it "as is," at a much lower price than the value the house had been appraised at. They had no trouble with the plumbing for over 2 years. When they were first informed of the existence of the septic tank they assured the defendant they intended to meet their responsibilities. After all this time, under such circumstances the seller has a right to rely on the contract entered into. If equity would relieve on account of such a mistake, there would be no stability in contracts.

It is important to remember that the doctrine of mutual mistake is not a

substitute for the doctrine of misrepresentation. What would be equitable when the defendant is guilty of fraud is not necessarily equitable when he made no misrepresentations at all; what is due care on the part of the plaintiff may be quite different when the plaintiff relied on a misrepresentation than when the plaintiff was merely mistaken. Accordingly, this court should not and cannot grant rescission for mutual mistake merely because if the defendant had been guilty of fraud, the court might have granted rescission.

■■ The plaintiffs' second contention is that the jury was so confused by the directed verdict in the contract action and the ambiguous nature of the verdict form in the libel action that the jury finding against the plaintiffs in the libel action should be reversed. As to the second contention, it is sufficient to point out that this verdict form was submitted by the plaintiffs over the defendants' objection. They are certainly in no position to complain of any alleged error which they caused.

Since the special interrogatory, as the parties all conceded below, governs the verdict, it is also doubtful that the validity of the libel verdict is properly before this court since no objection has ever been made that the special finding was against the manifest weight of the evidence.

■■ Nevertheless, it is clear from the instructions, that the jury were aware that they were to decide the claim of libel. There was no reason for them to believe as the plaintiffs argue, that the directed verdict included the libel claim as well. Indeed, this court will presume that the attorneys in their closing arguments, which are not in the record, explained to the jury what were the issues they were to decide. 2 Ill. L.&Pr. *Appeal and Error* §713 (1953).

■■ The plaintiffs also contend that by directing the verdict in the contract claim, the court informed the jury that the statements in the notice were truthful. Assuming, arguendo, that this were true, which is doubtful, there was no way, under the evidence submitted, that the jury could have found that the statement was not true at the time it was published. "Default" as defined by Webster's Third New International Dictionary is a failure to pay financial debts. Even Mr. Diedrich when he talked to the seller's attorney admitted they were behind on their payments, *i.e.*, in default. Nor had they at any time before the notice was published suggested they had a defense, or that they wanted to rescind. The only issue properly before the jury was whether the notice had been published for justifiable ends and proper motives. Accordingly, even if the jury took the ruling on the contract action to be also a ruling on the truthfulness of the statement, the plaintiffs were not prejudiced thereby.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GUILD, P. J., and SEIDENFELD, J., concur.