GLEN GIACOMAZZI *et al.*, Plaintiffs-Counterdefendants-Appellees and Cross-Appellants, *v.* URBAN SEARCH CORPORATION, Defendant-Counterplaintiff-Counterdefendant-Appellant.—(GUNNAR B. BENNETT, Defendant-Counterplaintiff-Counterdefendant-Appellee and Cross-Appellant.)

First District (2nd Division)    No. 79-819

Opinion filed June 10, 1980.

Steven Schwab, of Chicago, for appellant Urban Search Corporation.

Burke, Smith, Nash and Shea, Ltd., of Chicago (Kenneth M. Lodge, of counsel), for appellees Glen Giacomazzi and Pamela Giacomazzi.

Defrees & Fiske, of Chicago (Gary Schuman, of counsel), for appellee Gunnar Bennett.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiffs, Glen and Pamela Giacomazzi, filed suit in the circuit court of Cook County to recover an earnest money deposit of $3750 made for the purchase of a condominium unit owned by defendant Gunnar Bennett. This deposit was placed with the broker for the transaction, defendant Urban Search. Prior to trial plaintiffs moved for summary judgment on count I of the complaint, which requested rescission on the basis of mistake or misrepresentation. The court granted summary judgment on this count, awarding plaintiff $2750 and defendant Bennett (who had counterclaimed for damages incurred by the failure to complete the sale) $1000, and declared that defendant Urban Search (which had cross- and counter-claimed for its commission) had fulfilled its brokerage duties. The court then orally denied plaintiffs' motion for summary judgment on count II, which was premised on Bennett's noncompliance with disclosure requirements of the Illinois Condominium Act, and granted summary judgment on this count in favor of Bennett. This appeal by all parties resulted.

The facts as contained in the pleadings, documents, depositions, and interrogatories are as follows: Defendant Bennett occupied a unit in a cooperative apartment house as a sublessee. In January 1973, he was informed that Development Management Group, Inc. (Development), had purchased the building to convert it into condominium units. Bennett dealt with sales agent Sue Gin, who informed him of the various costs and assessments involved in the project. Bennett then agreed to purchase the unit and received title from Chicago City Bank & Trust Company in April 1973. The 1973 tax assessments were sent to Development which

apportioned the assessment, billing each unit owner individually. Bennett paid his 1973 tax installments directly to Development.

In 1975, Bennett contacted sales agent Gin, now with the Urban Search brokerage firm, to sell his condominium unit. Plaintiffs have presented documents to demonstrate that Urban Search had the same address and telephone number as Development and additionally, that two officers of Development were employees of Urban Search. Urban Search showed Bennett's unit to plaintiffs, who signed a contract for its purchase on August 27, 1975; the contract was signed by Bennett on September 4, 1975. Plaintiffs allege that they inquired about the real estate taxes prior to the execution of the contract and were told by Gin that the 1975 bill was $531 per year. Urban Search, however, denies such a representation. Approximately one month later, Gin presented plaintiffs with a disclosure form prepared by Bennett which listed the "Last Ascertainable Tax Figure" as $531. Bennett later presented an affidavit stating that he had derived this figure from his 1974 income tax form filed earlier in 1975.

Plaintiffs deposited $3750 with Urban Search as earnest money for the unit, the purchase price of which was negotiated as $42,000. The standard form contract called for defendant Bennett to convey to plaintiffs by a recordable warranty deed subject to, *inter alia*, general taxes for the year 1974 and subsequent years. No specific reference to the amount of the taxes is reflected in the contract.

Sometime between July and August of 1975, the 1974 Cook County tax bills were mailed. This bill, as in the past, went directly to Chicago City Bank & Trust holding for the beneficial owners (Development and Bennett). Both defendants deny knowledge of the increased tax bill prior to the contract signing or presentation of the disclosure statement.

Plaintiffs allege that they learned of the increased bill (from $531 to $912) in December 1975, at or about the time set for closing the transaction. When Bennett refused to renegotiate the unit price, plaintiffs refused to close and demanded return of their earnest money. Plaintiffs filed suit against Bennett and Urban Search for the earnest money, seeking rescission based on mutual mistake of fact or negligent or intentional misrepresentation.

Bennett, through Urban Search, completed the sale of his unit to another purchaser. Upon plaintiffs' suit, he counter- and cross-claimed for damages and lost profit on the second sale caused by plaintiffs' refusal to complete the sale. Urban Search also cross- and counter-claimed for its sales commission on the aborted sale. Each defendant maintains that any misrepresentations or mistakes of fact are attributable to the other defendant. All parties have denied any liability. Following the trial court's

rather equitable attempt to split the disputed earnest money, all parties appealed.

## I.

■■ In their first count plaintiffs allege that defendants' misstatements concerning the amount of the real estate tax caused a material mistake of fact which should allow rescission of the contract. It is well settled that "[r]escission of a contract is proper where one party mistakenly enters into a contract because he reasonably relies on the other party's innocent misrepresentations of a material fact." (*Geist v. Lehmann* (1974), 19 Ill. App. 3d 557, 560, 312 N.E.2d 42.) And further, if the misstatements were not innocent, then too rescission is allowed, although perhaps on a less demanding standard. Fraudulent or knowing misrepresentation is characterized by a statement of material fact, false and known to be false by the person making it, which is intended to induce an act by the other party, who, in so acting, relies on the truth of the statement. *Roth v. Roth* (1970), 45 Ill. 2d 19, 23, 256 N.E.2d 838.

Thus, although the elements of fraudulent misrepresentation and mutual mistake of fact are similar, the required evidentiary showings of reasonable or actual reliance differ. So too, the relief to be granted in each situation can vary. "It is important to remember that the doctrine of mutual mistake is not a substitute for the doctrine of misrepresentation. What would be equitable when the defendant is guilty of fraud is not necessarily equitable when he made no misrepresentations at all; what is due care on the part of the plaintiff may be quite different when the plaintiff relied on a misrepresentation than when the plaintiff was merely mistaken." (*Diedrich v. Northern Illinois Publishing Co.* (1976), 39 Ill. App. 3d 851, 860-61, 350 N.E.2d 857.) Accordingly, resolution of the mistake/misrepresentation claims in the case at bar depends upon the facts relative to reliance, materiality, due care, knowledge, and intent of the parties.

Initially, we note that whether mistake or misrepresentation, the matter of the misstatement must be material. To be material, the condition must be essential to one of the parties and must be mutually agreed upon and understood by the parties. (See also *Dillenberger v. Ziebold* (1979), 70 Ill. App. 3d 585, 588-89, 388 N.E.2d 936.) In *Dillenberger*, that the actual amount of tillable acreage (over 145 acres) contained on a large piece of land (over 352 acres) bid for in gross, differed from that roughly estimated prior to the sale by approximately 30 acres, was insufficiently material to mandate rescission. Such a result is consistent with Corbin's discussion of mistakes in value of land:

> "Rescission of a contract for the sale of property, because of a mistake as to a factor materially affecting value, is usually

obtainable if the mistake was 'mutual.' If the mistake was unilateral, rescission is less often granted than in the case of construction contracts. This may be justified for the reason that in sales cases the parties are more likely to understand that they assume the risks as to such factors; this may be the more usual custom." (3 Corbin on Contracts §605, at 643-44 (1960).)

Thus in *Dillenberger*, although the difference in tillable acres was substantial, the trial court properly found that it was not material or essential to the contract for transfer of the land. In contrast, in *Geist v. Lehmann* (1974), 19 Ill. App. 3d 557, 312 N.E.2d 42, the appellate court stated that the mistake as to property boundaries in that case could be material and could warrant rescission but affirmed the lower court's finding, after a trial, that materiality had not been established by the evidence.

■■ The standard which would warrant a factual finding of material mistake in the subject matter or terms of a contract has been expressed as whether "this matter is of such grave consequence that enforcement of the contract would be unconscionable." (*Diedrich v. Northern Illinois Publishing Co.* (1976), 39 Ill. App. 3d 851, 857, 350 N.E.2d 857.) Under any definition of materiality it is incumbent upon plaintiffs to prove that the amount of the real estate taxes was of the essence to their decision or ability to purchase the condominium. We cannot say, as a matter of law, that real estate taxes per se are or are not sufficiently material to the real estate contract to warrant rescission. Instead, it is a factual matter subject to evidence that the amount of the taxes was of substantial importance to one of the parties. In those instances where the purchasers are on a fixed income or of limited resources, the amount of the real estate taxes might be of primary importance, not only to the purchasers themselves, but also to their mortgagee who is evaluating the feasibility of the loan. In the instant case, agent Gin, in her deposition, stated that the amount of real estate taxes was often of significant importance to the purchaser of property. This statement is indicative of the possible materiality of the tax bill, implicating as it does the fixed monthly costs for property. The question of factual materiality nonetheless remains to be decided by the trier of fact. See, *e.g., Geist*, at 561.

■■ Factually, the taxes may have been of material importance only to plaintiffs, who were initially the only parties seeking relief. We note however, that whether the mistake was made by one or both parties is practically immaterial. "What the court needs to know before giving a remedy is whether the mistake substantially affects the party seeking relief, whether the other party can be put in statu quo, how the granting of relief will affect third parties, and whether the petitioner's conduct has created an estoppel." (3 Corbin on Contracts §608, at 673 (1960).) Thus, it

is plaintiffs' burden to produce evidence at trial to show the materiality of the taxes.

Aside from the issue of materiality, many questions remain unanswered by the contradictory pleadings of the parties: Was the tax bill a condition of the agreement? Was plaintiffs' reliance on the statements of future taxes reasonable? Were such statements actually made? What were the intentions of the parties? Would either party have had knowledge of the actual tax bills? Is Urban Search an alter ego for Development, so as to be chargeable with Development's knowledge? Did Development receive the tax bill prior to the time of contracting or of presenting the disclosure statement to plaintiffs? Did Bennett know of the tax bill variation? Was it a mistake or a misrepresentation? Did Urban Search owe a duty to Bennett or plaintiffs to tell them of the tax change? Did Urban deliver a ready, willing and able buyer so as to be entitled to a commission? These and other factual questions upon whose resolution the legal issues bear remain.

■ The parties have presented this court with the familiar rules regarding the propriety of summary judgment and are in general agreement that the key issue is whether a genuine, triable issue of fact existed at the time the judge made his ruling. As the above list indicates, although perhaps some of the existing questions are those of law, there still exist disputed facts which are not ascertainable simply from the facts and inferences contained in the pleadings, documents and interrogatories, and which depend on testimony and judgments of witness credibility for their determination. Triable issues of fact exist regarding the materiality of the representation and whether the plaintiffs were entitled to rely upon them, among other issues, and thus summary disposition of the parties' claims was not appropriate. (See *Malchow v. Tiarks* (1970), 122 Ill. App. 2d 304, 313-15, 258 N.E.2d 811.) Yet, it must be noted that on remand, and after trial, the result may well be the same, rescission being an equitable remedy dependent on the circumstances surrounding the request for relief. The result, nevertheless, may not be as equitable for all of the parties as that fashioned, perhaps prematurely, by the trial court below. As one commentator has stated in discussing his relief:

> "It is believed, therefore, that when a court allows rescission on the ground that there was reason to know of the mistake, it is in most cases doing so because the consequences of the mistake are serious and it is inequitable to hold the mistaken party to the contract. * * * Because of the seriousness of the mistake, rescission is not made inequitable by the fact that the other party assented in good faith, had expectations of performance, and is disappointed in not enjoying a profitable bargain. Justice requires

that he suffer this much disappointment." (3 Corbin on Contracts §610, at 695-96 (1960).)

Thus, the relief provided by the remedy of rescission is intended to be disbursed in an equitable manner, rather than by a strict legal formula. Nevertheless, because of the existing factual questions and the jury demands entered by the parties, the case must be remanded for trial.

## II.

In their second count plaintiffs have requested rescission for defendant Bennett's failure to comply with the disclosure requirements of section 22 of the Illinois Condominium Property Act (Ill. Rev. Stat. 1979, ch. 30, par. 322). This section was added (Laws of 1963, at 1120, added by Pub. Act 77-2297, §1, eff. Oct. 1, 1972) to the previously existing act which gave statutory recognition to the form of property ownership known as the "condominium." (See Ill. Rev. Stat. 1963, ch. 30, par. 301 *et seq.*) On May 9, 1972, Representative David Regner introduced in the Illinois House a bill to add section 22, describing it as a "truth in selling" provision. (House Debates, May 15, 1972, third reading.) When the bill was debated in the Senate, the sponsor there, Senator Graham, explained that the bill was directed toward providing information for the elderly, and presumably those on fixed incomes, so that they would be financially aware at the outset of purchase negotiations. (Senate Debates, June 21, 1972.) It has further been noted that one of the primary forces behind the passage of disclosure legislation has been the need for purchaser protection from hidden long-term condominium management agreements entered into between project development and management groups which have in fact the same principal parties. Krebs, *The Legislative Response to "Sweetheart" Management Contracts: Protecting the Condominium Purchaser*, 55 Chi.-Kent L. Rev. 319 (1979).

Section 22 was designed to alleviate these practices by requiring on the initial sale or offering for sale of any condominium unit, that the seller provide certain descriptive documents relative to the condominium project. As in effect at the time relevant here, the section required the seller to furnish the following:

"(a) the Declaration;

(b) the Bylaws of the association;

(c) a projected operating budget for the condominium unit to be sold to the prospective buyer, including full details concerning the estimated monthly payments for the condominium unit, estimated monthly charges for maintenance or management of the condominium property, and monthly charges for the use of recreational facilities; and

(d) a floor plan of the apartment to be purchased by the prospective buyer and the street address of the unit, if any, and if the unit has no unique street address, the street address of the project."

(Ill. Rev. Stat. 1977, ch. 30, par. 322.)[1]

Section 22 goes on to specify that if the information is not furnished in accord with the above requirements, the purchaser may rescind the contract prior to closing and receive a refund of all money deposited.

In the instant case, defendant Bennett concedes that he did not comply with this statute. He contends, however, that the sale in issue was not an initial sale or offering of the condominium unit as contemplated in the statute. Plaintiff responds that since Bennett was in possession of the unit at the time of his purchase, the instant sale is the "initial sale." This claim is premised upon the final paragraph of section 22:

"A sale is not an initial sale for the purposes of this Section if there is not a *bona fide transfer of the ownership and possession* of the condominium unit for the purpose of occupancy of such unit as the result of the sale or if the sale was entered into for the purpose of avoiding the requirements of this Section. The buyer in the first bona fide sale of any condominium unit has the rights granted to buyers under this Section. If the buyer in any sale of a condominium unit asserts that such sale is the first bona fide sale of that unit, the seller has the burden of proving that his interest was acquired through a bona fide sale." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 30, par. 322.

This paragraph requires a transfer of both ownership and possession for a bona fide sale. This requirement parallels the original intent of the Act that it apply only to owners of units in fee simple absolute. "This * * * is consistent with section 303 of the Illinois Act which clearly prevents a leasehold estate from being submitted to the Illinois Act." (Kane & Helms, *The Illinois Condominium Property Act,* 1970 U. Ill. L.F. 157, 161.) Accordingly, section 22 was designed to protect only bona fide purchasers in fee simple. Plaintiffs' construction of the possession factor seems to contravene the intent of the legislature in formulating this enactment. If the disclosure requirements were directed, among other things, at hidden management-development contracts, it would be absurd to foreclose present tenants from disclosure. Rather, it is manifest that the Act is intended to protect the first true purchaser of the unit. That this was the design for section 22 is reinforced by section 22.1, added in 1980, which states that in the event of a *resale* the unit owner has certain

---

[1] Several other disclosure requirements for developers of conversion condominiums were added by Pub. Act 81-897, §1, eff. Jan. 1, 1980. See Ill. Rev. Stat. 1979, ch. 30, par. 322(e).

disclosure responsibilities. Ill. Rev. Stat. 1979, ch. 30, par. 322.1, added by Pub. Act 81-897, §1, eff. Jan. 1, 1980.

■■ Accordingly, the act in force at the time of Bennett's sale did not apply to resales of the type presented here. Bennett's tenancy and right to possession under that tenancy ended at the time when he took possession and ownership under the condominium agreement. Thus possession under the leasehold ended immediately prior to new possession in fee simple. To construe the "possession" requirement in any other way would be to make this provision of the Act incongruous with the whole. Therefore, the "initial" sale disclosure requirements would not apply to the instant sale and summary judgment was appropriately granted to defendant Bennett on this count.

Therefore, summary judgment on the first count is reversed and remanded with directions; summary judgment on the second count is affirmed. On the appeal by Urban Search and the cross-appeal by Bennett, the cause is also remanded for a determination of whether Urban Search is entitled to its broker's commission and whether Bennett is entitled to damages for the failure of plaintiff to complete the sale.

Affirmed in part; reversed in part; remanded with directions.

PERLIN, P. J., and DOWNING, J., concur.